(Slip Opinion)       OCTOBER TERM, 2007       1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KENNEDY *v.* LOUISIANA

### CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 07–343.   Argued April 16, 2008—Decided June 25, 2008

Louisiana charged petitioner with the aggravated rape of his then-8-year-old stepdaughter.  He was convicted and sentenced to death under a state statute authorizing capital punishment for the rape of a child under 12.  The State Supreme Court affirmed, rejecting petitioner's reliance on *Coker* v. *Georgia*, 433 U. S. 584, which barred the use of the death penalty as punishment for the rape of an adult woman but left open the question which, if any, other nonhomicide crimes can be punished by death consistent with the Eighth Amendment.  Reasoning that children are a class in need of special protection, the state court held child rape to be unique in terms of the harm it inflicts upon the victim and society and concluded that, short of first-degree murder, there is no crime more deserving of death.  The court acknowledged that petitioner would be the first person executed since the state law was amended to authorize the death penalty for child rape in 1995, and that Louisiana is in the minority of jurisdictions authorizing death for that crime.  However, emphasizing that four more States had capitalized child rape since 1995 and at least eight others had authorized death for other nonhomicide crimes, as well as that, under *Roper* v. *Simmons*, 543 U. S. 551, and *Atkins* v. *Virginia*, 536 U. S. 304, it is the direction of change rather than the numerical count that is significant, the court held petitioner's death sentence to be constitutional.

*Held:* The Eighth Amendment bars Louisiana from imposing the death penalty for the rape of a child where the crime did not result, and was not intended to result, in the victim's death.  Pp. 8–36.

   1. The Amendment's Cruel and Unusual Punishment Clause "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Trop* v. *Dulles*, 356 U. S. 86, 101.  The standard for extreme cruelty "itself remains the same,

but its applicability must change as the basic mores of society change." *Furman* v. *Georgia*, 408 U. S. 238, 382.  Under the precept of justice that punishment is to be graduated and proportioned to the crime, informed by evolving standards, capital punishment must "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.' " *Roper, supra,* at 568.  Applying this principle, the Court held in *Roper* and *Atkins* that the execution of juveniles and mentally retarded persons violates the Eighth Amendment because the offender has a diminished personal responsibility for the crime.  The Court also has found the death penalty disproportionate to the crime itself where the crime did not result, or was not intended to result, in the victim's death.  See, *e.g., Coker, supra; Enmund* v. *Florida*, 458 U. S. 782.  In making its determination, the Court is guided by "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions." *Roper*, *supra,* at 563.  Consensus is not dispositive, however.  Whether the death penalty is disproportionate to the crime also depends on the standards elaborated by controlling precedents and on the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose.  Pp. 8–10.

 2. A review of the authorities informed by contemporary norms, including the history of the death penalty for this and other nonhomicide crimes, current state statutes and new enactments, and the number of executions since 1964, demonstrates a national consensus against capital punishment for the crime of child rape.  Pp. 11–23.

 (a) The Court follows the approach of cases in which objective indicia of consensus demonstrated an opinion against the death penalty for juveniles, see *Roper, supra,* mentally retarded offenders, see *Atkins, supra,* and vicarious felony murderers, see *Enmund, supra.* Thirty-seven jurisdictions—36 States plus the Federal Government—currently impose capital punishment, but only six States authorize it for child rape.  In 45 jurisdictions, by contrast, petitioner could not be executed for child rape of any kind.  That number surpasses the 30 States in *Atkins* and *Roper* and the 42 in *Enmund* that prohibited the death penalty under the circumstances those cases considered. Pp. 11–15.

 (b) Respondent's argument that *Coker*'s general discussion contrasting murder and rape, 433 U. S., at 598, has been interpreted too expansively, leading some States to conclude that *Coker* applies to child rape when in fact it does not, is unsound.  *Coker*'s holding was narrower than some of its language read in isolation indicates.  The *Coker* plurality framed the question as whether, "with respect to rape of an adult woman," the death penalty is disproportionate punish-

ment, *id.,* at 592, and it repeated the phrase "adult woman" or "adult female" eight times in discussing the crime or the victim. The distinction between adult and child rape was not merely rhetorical; it was central to *Coker*'s reasoning, including its analysis of legislative consensus. See, *e.g., id.,* at 595–596. There is little evidence to support respondent's contention that state legislatures have understood *Coker* to state a broad rule that covers minor victims, and state courts have uniformly concluded that *Coker* did not address that crime. Accordingly, the small number of States that have enacted the death penalty for child rape is relevant to determining whether there is a consensus against capital punishment for the rape of a child. Pp. 15–20.

(c) A consistent direction of change in support of the death penalty for child rape might counterbalance an otherwise weak demonstration of consensus, see, *e.g., Atkins,* 536 U. S., at 315, but no showing of consistent change has been made here. That five States may have had pending legislation authorizing death for child rape is not dispositive because it is not this Court's practice, nor is it sound, to find contemporary norms based on legislation proposed but not yet enacted. Indeed, since the parties submitted their briefs, the legislation in at least two of the five States has failed. Further, evidence that, in the last 13 years, six new death penalty statutes have been enacted, three in the last two years, is not as significant as the data in *Atkins*, where 18 States between 1986 and 2001 had enacted legislation prohibiting the execution of mentally retarded persons. See *id.,* at 314–315. Respondent argues that this case is like *Roper* because, there, only five States had shifted their positions between 1989 and 2005, one less State than here. See 543 U. S., at 565. But the *Roper* Court emphasized that the slow pace of abolition was counterbalanced by the total number of States that had recognized the impropriety of executing juvenile offenders. See *id.,* at 566–567. Here, the fact that only six States have made child rape a capital offense is not an indication of a trend or change in direction comparable to the one in *Roper*. The evidence bears a closer resemblance to that in *Enmund*, where the Court found a national consensus against death for vicarious felony murder despite eight jurisdictions having authorized it. See 458 U. S., at 789, 792. Pp. 20–22.

(d) Execution statistics also confirm that there is a social consensus against the death penalty for child rape. Nine States have permitted capital punishment for adult or child rape for some length of time between the Court's 1972 *Furman* decision and today; yet no individual has been executed for the rape of an adult or child since 1964, and no execution for any other nonhomicide offense has been conducted since 1963. Louisiana is the only State since 1964 that has

sentenced an individual to death for child rape, and petitioner and another man so sentenced are the only individuals now on death row in the United States for nonhomicide offenses. Pp. 22–23.

3. Informed by its own precedents and its understanding of the Constitution and the rights it secures, the Court concludes, in its independent judgment, that the death penalty is not a proportional punishment for the crime of child rape. Pp. 23–35.

(a) The Court's own judgment should be brought to bear on the death penalty's acceptability under the Eighth Amendment. See, *e.g., Coker, supra*, at 597. Rape's permanent and devastating impact on a child suggests moral grounds for questioning a rule barring capital punishment simply because the crime did not result in the victim's death, but it does not follow that death is a proportionate penalty for child rape. The constitutional prohibition against excessive or cruel and unusual punishments mandates that punishment "be exercised within the limits of civilized standards." *Trop,* 356 U. S., at 99–100. Evolving standards of decency counsel the Court to be most hesitant before allowing extension of the death penalty, especially where no life was taken in the commission of the crime. See, *e.g., Coker,* 433 U. S., at 597–598; *Enmund*, 458 U. S., at 797. Consistent with those evolving standards and the teachings of its precedents, the Court concludes that there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individuals, even including child rape, on the other. The latter crimes may be devastating in their harm, as here, but "in terms of moral depravity and of the injury to the person and to the public," they cannot compare to murder in their "severity and irrevocability," *id,* at 598. The Court finds significant the substantial number of executions that would be allowed for child rape under respondent's approach. Although narrowing aggravators might be used to ensure the death penalty's restrained application in this context, as they are in the context of capital murder, all such standards have the potential to result in some inconsistency of application. The Court, for example, has acknowledged that the requirement of general rules to ensure consistency of treatment, see, *e.g., Godfrey* v. *Georgia*, 446 U. S. 420, and the insistence that capital sentencing be individualized, see, *e.g., Woodson* v. *North Carolina*, 428 U. S. 280, have resulted in tension and imprecision. This approach might be sound with respect to capital murder but it should not be introduced into the justice system where death has not occurred. The Court has spent more than 32 years developing a foundational jurisprudence for capital murder to guide the States and juries in imposing the death penalty. Beginning the same process for crimes for which no one has been executed in more than 40 years would require experimentation in an area where

a failed experiment would result in the execution of individuals un-
deserving of death. Pp. 24–30.

  (b) The Court's decision is consistent with the justifications of-
fered for the death penalty, retribution and deterrence, see, *e.g.,*
*Gregg* v. *Georgia*, 428 U. S. 153, 183. Among the factors for deter-
mining whether retribution is served, the Court must look to whether
the death penalty balances the wrong to the victim in nonhomicide
cases. Cf. *Roper, supra,* at 571. It is not at all evident that the child
rape victim's hurt is lessened when the law permits the perpetrator's
death, given that capital cases require a long-term commitment by
those testifying for the prosecution. Society's desire to inflict death
for child rape by enlisting the child victim to assist it over the course
of years in asking for capital punishment forces a moral choice on the
child, who is not of mature age to make that choice. There are also
relevant systemic concerns in prosecuting child rape, including the
documented problem of unreliable, induced, and even imagined child
testimony, which creates a "special risk of wrongful execution" in
some cases. Cf. *Atkins*, *supra*, at 321. As to deterrence, the evidence
suggests that the death penalty may not result in more effective en-
forcement, but may add to the risk of nonreporting of child rape out
of fear of negative consequences for the perpetrator, especially if he is
a family member. And, by in effect making the punishment for child
rape and murder equivalent, a State may remove a strong incentive
for the rapist not to kill his victim. Pp. 30–35.

  4. The concern that the Court's holding will effectively block fur-
ther development of a consensus favoring the death penalty for child
rape overlooks the principle that the Eighth Amendment is defined
by "the evolving standards of decency that mark the progress of a
maturing society," *Trop,* 356 U. S., at 101. Confirmed by the Court's
repeated, consistent rulings, this principle requires that resort to
capital punishment be restrained, limited in its instances of applica-
tion, and reserved for the worst of crimes, those that, in the case of
crimes against individuals, take the victim's life. P. 36.

957 So. 2d 757, reversed and remanded.

  KENNEDY, J., delivered the opinion of the Court, in which STEVENS,
SOUTER, GINSBURG, and BREYER, JJ., joined. ALITO, J., filed a dissenting
opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–343

PATRICK KENNEDY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[June 25, 2008]

JUSTICE KENNEDY delivered the opinion of the Court.

The National Government and, beyond it, the separate States are bound by the proscriptive mandates of the Eighth Amendment to the Constitution of the United States, and all persons within those respective jurisdictions may invoke its protection. See Amdts. 8 and 14, §1; *Robinson* v. *California*, 370 U. S. 660 (1962). Patrick Kennedy, the petitioner here, seeks to set aside his death sentence under the Eighth Amendment. He was charged by the respondent, the State of Louisiana, with the aggravated rape of his then-8-year-old stepdaughter. After a jury trial petitioner was convicted and sentenced to death under a state statute authorizing capital punishment for the rape of a child under 12 years of age. See La. Stat. Ann. §14:42 (West 1997 and Supp. 1998). This case presents the question whether the Constitution bars respondent from imposing the death penalty for the rape of a child where the crime did not result, and was not intended to result, in death of the victim. We hold the Eighth Amendment prohibits the death penalty for this offense. The Louisiana statute is unconstitutional.

## I

Petitioner's crime was one that cannot be recounted in these pages in a way sufficient to capture in full the hurt and horror inflicted on his victim or to convey the revulsion society, and the jury that represents it, sought to express by sentencing petitioner to death. At 9:18 a.m. on March 2, 1998, petitioner called 911 to report that his stepdaughter, referred to here as L. H., had been raped. He told the 911 operator that L. H. had been in the garage while he readied his son for school. Upon hearing loud screaming, petitioner said, he ran outside and found L. H. in the side yard. Two neighborhood boys, petitioner told the operator, had dragged L. H. from the garage to the yard, pushed her down, and raped her. Petitioner claimed he saw one of the boys riding away on a blue 10-speed bicycle.

When police arrived at petitioner's home between 9:20 and 9:30 a.m., they found L. H. on her bed, wearing a T-shirt and wrapped in a bloody blanket. She was bleeding profusely from the vaginal area. Petitioner told police he had carried her from the yard to the bathtub and then to the bed. Consistent with this explanation, police found a thin line of blood drops in the garage on the way to the house and then up the stairs. Once in the bedroom, petitioner had used a basin of water and a cloth to wipe blood from the victim. This later prevented medical personnel from collecting a reliable DNA sample.

L. H. was transported to the Children's Hospital. An expert in pediatric forensic medicine testified that L. H.'s injuries were the most severe he had seen from a sexual assault in his four years of practice. A laceration to the left wall of the vagina had separated her cervix from the back of her vagina, causing her rectum to protrude into the vaginal structure. Her entire perineum was torn from the posterior fourchette to the anus. The injuries required emergency surgery.

At the scene of the crime, at the hospital, and in the first weeks that followed, both L. H. and petitioner maintained in their accounts to investigators that L. H. had been raped by two neighborhood boys. One of L. H.'s doctors testified at trial that L. H. told all hospital personnel the same version of the rape, although she reportedly told one family member that petitioner raped her. L. H. was interviewed several days after the rape by a psychologist. The interview was videotaped, lasted three hours over two days, and was introduced into evidence at trial. On the tape one can see that L. H. had difficulty discussing the subject of the rape. She spoke haltingly and with long pauses and frequent movement. Early in the interview, L. H. expressed reservations about the questions being asked:

> "I'm going to tell the same story. They just want me to change it. . . . They want me to say my Dad did it. . . . I don't want to say it. . . . I tell them the same, same story." Def. Exh. D–7, 01:29:07–:36.

She told the psychologist that she had been playing in the garage when a boy came over and asked her about Girl Scout cookies she was selling; and that the boy "pulled [her by the legs to] the backyard," *id.,* at 01:47:41–:52, where he placed his hand over her mouth, "pulled down [her] shorts," Def. Exh. D–8, 00:03:11–:12, and raped her, *id.,* at 00:14:39–:40.

Eight days after the crime, and despite L. H.'s insistence that petitioner was not the offender, petitioner was arrested for the rape. The State's investigation had drawn the accuracy of petitioner and L. H.'s story into question. Though the defense at trial proffered alternative explanations, the case for the prosecution, credited by the jury, was based upon the following evidence: An inspection of the side yard immediately after the assault was inconsistent with a rape having occurred there, the grass having

been found mostly undisturbed but for a small patch of coagulated blood. Petitioner said that one of the perpetrators fled the crime scene on a blue 10-speed bicycle but gave inconsistent descriptions of the bicycle's features, such as its handlebars. Investigators found a bicycle matching petitioner and L. H.'s description in tall grass behind a nearby apartment, and petitioner identified it as the bicycle one of the perpetrators was riding. Yet its tires were flat, it did not have gears, and it was covered in spider webs. In addition police found blood on the underside of L. H.'s mattress. This convinced them the rape took place in her bedroom, not outside the house.

Police also found that petitioner made two telephone calls on the morning of the rape. Sometime before 6:15 a.m., petitioner called his employer and left a message that he was unavailable to work that day. Petitioner called back between 6:30 and 7:30 a.m. to ask a colleague how to get blood out of a white carpet because his daughter had "'just become a young lady.'" Brief for Respondent 12. At 7:37 a.m., petitioner called B & B Carpet Cleaning and requested urgent assistance in removing bloodstains from a carpet. Petitioner did not call 911 until about an hour and a half later.

About a month after petitioner's arrest L. H. was removed from the custody of her mother, who had maintained until that point that petitioner was not involved in the rape. On June 22, 1998, L. H. was returned home and told her mother for the first time that petitioner had raped her. And on December 16, 1999, about 21 months after the rape, L. H. recorded her accusation in a videotaped interview with the Child Advocacy Center.

The State charged petitioner with aggravated rape of a child under La. Stat. Ann. §14:42 (West 1997 and Supp. 1998) and sought the death penalty. At all times relevant to petitioner's case, the statute provided:

"A. Aggravated rape is a rape committed . . . where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

.　　.　　.　　.　　.

"(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.

.　　.　　.　　.　　.

"D. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

"(1) However, if the victim was under the age of twelve years, as provided by Paragraph A(4) of this Section:

"(a) And if the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury."

(Since petitioner was convicted and sentenced, the statute has been amended to include oral intercourse within the definition of aggravated rape and to increase the age of the victim from 12 to 13. See La. Stat. Ann. §14:42 (West Supp. 2007).)

Aggravating circumstances are set forth in La. Code Crim. Proc. Ann., Art. 905.4 (West 1997 Supp.). In pertinent part and at all times relevant to petitioner's case, the provision stated:

"A. The following shall be considered aggravating circumstances:

"(1) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, forcible

rape, aggravated kidnapping, second degree kidnapping, aggravated burglary, aggravated arson, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, or simple robbery.

.         .         .         .         .

"(10) The victim was under the age of twelve years or sixty-five years of age or older."

The trial began in August 2003. L. H. was then 13 years old. She testified that she "'woke up one morning and Patrick was on top of [her].'" She remembered petitioner bringing her "[a] cup of orange juice and pills chopped up in it" after the rape and overhearing him on the telephone saying she had become a "young lady." 2005–1981, pp. 12, 15, 16 (La. 5/22/07), 957 So. 2d 757, 767, 769, 770. L. H. acknowledged that she had accused two neighborhood boys but testified petitioner told her to say this and that it was untrue. *Id.,* at 769.

The jury having found petitioner guilty of aggravated rape, the penalty phase ensued. The State presented the testimony of S. L., who is the cousin and goddaughter of petitioner's ex-wife. S. L. testified that petitioner sexually abused her three times when she was eight years old and that the last time involved sexual intercourse. *Id.,* at 772. She did not tell anyone until two years later and did not pursue legal action.

The jury unanimously determined that petitioner should be sentenced to death. The Supreme Court of Louisiana affirmed. See *id.,* at 779–789, 793; see also *State* v. *Wilson*, 96–1392, 96–2076 (La. 12/13/96), 685 So. 2d 1063 (upholding the constitutionality of the death penalty for child rape). The court rejected petitioner's reliance on *Coker* v. *Georgia*, 433 U. S. 584 (1977), noting that, while *Coker* bars the use of the death penalty as punishment for the rape of an adult woman, it left open the question which, if any, other nonhomicide crimes can be punished

by death consistent with the Eighth Amendment. Because "'children are a class that need special protection,'" the state court reasoned, the rape of a child is unique in terms of the harm it inflicts upon the victim and our society. 957 So. 2d, at 781.

The court acknowledged that petitioner would be the first person executed for committing child rape since La. Stat. Ann. §14:42 was amended in 1995 and that Louisiana is in the minority of jurisdictions that authorize the death penalty for the crime of child rape. But following the approach of *Roper* v. *Simmons*, 543 U. S. 551 (2005), and *Atkins* v. *Virginia*, 536 U. S. 304 (2002), it found significant not the "numerical counting of which [S]tates . . . stand for or against a particular capital prosecution," but "the direction of change." 957 So. 2d, at 783 (emphasis deleted). Since 1993, the court explained, four more States—Oklahoma, South Carolina, Montana, and Georgia—had capitalized the crime of child rape and at least eight States had authorized capital punishment for other nonhomicide crimes. By its count, 14 of the then-38 States permitting capital punishment, plus the Federal Government, allowed the death penalty for nonhomicide crimes and 5 allowed the death penalty for the crime of child rape. See *id.,* at 785–786.

The state court next asked whether "child rapists rank among the worst offenders." *Id.,* at 788. It noted the severity of the crime; that the execution of child rapists would serve the goals of deterrence and retribution; and that, unlike in *Atkins* and *Roper*, there were no characteristics of petitioner that tended to mitigate his moral culpability. *Id.,* at 788–789. It concluded: "[S]hort of first-degree murder, we can think of no other non-homicide crime more deserving [of capital punishment]." *Id.,* at 789.

On this reasoning the Supreme Court of Louisiana rejected petitioner's argument that the death penalty for

the rape of a child under 12 years is disproportionate and upheld the constitutionality of the statute. Chief Justice Calogero dissented. *Coker*, *supra,* and *Eberheart* v. *Georgia*, 433 U. S. 917 (1977), in his view, "set out a bright-line and easily administered rule" that the Eighth Amendment precludes capital punishment for any offense that does not involve the death of the victim. 957 So. 2d, at 794.

We granted certiorari. See 552 U. S. ___ (2008).

## II

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins*, 536 U. S., at 311, n. 7. The Court explained in *Atkins*, *id.,* at 311, and *Roper, supra*, at 560, that the Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic "precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." *Weems* v. *United States*, 217 U. S. 349, 367 (1910). Whether this requirement has been fulfilled is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that "currently prevail." *Atkins*, *supra,* at 311. The Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). This is because "[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Furman* v. *Georgia*, 408 U. S. 238, 382 (1972) (Burger, C. J., dissenting).

Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule. See *Trop, supra,* at 100 (plurality opinion). As we shall discuss, punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution. See *Harmelin* v. *Michigan,* 501 U. S. 957, 999 (1991) (KENNEDY, J., concurring in part and concurring in judgment); see also Part IV–B, *infra.* It is the last of these, retribution, that most often can contradict the law's own ends. This is of particular concern when the Court interprets the meaning of the Eighth Amendment in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint.

For these reasons we have explained that capital punishment must "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper, supra,* at 568 (quoting *Atkins, supra,* at 319). Though the death penalty is not invariably unconstitutional, see *Gregg* v. *Georgia,* 428 U. S. 153 (1976), the Court insists upon confining the instances in which the punishment can be imposed.

Applying this principle, we held in *Roper* and *Atkins* that the execution of juveniles and mentally retarded persons are punishments violative of the Eighth Amendment because the offender had a diminished personal responsibility for the crime. See *Roper, supra,* at 571–573; *Atkins, supra,* at 318, 320. The Court further has held that the death penalty can be disproportionate to the crime itself where the crime did not result, or was not intended to result, in death of the victim. In *Coker,* 433 U. S. 584, for instance, the Court held it would be unconstitutional to execute an offender who had raped an adult woman. See also *Eberheart, supra* (holding unconstitu-

tional in light of *Coker* a sentence of death for the kidnap-
ing and rape of an adult woman). And in *Enmund* v.
*Florida*, 458 U. S. 782 (1982), the Court overturned the
capital sentence of a defendant who aided and abetted a
robbery during which a murder was committed but did not
himself kill, attempt to kill, or intend that a killing would
take place. On the other hand, in *Tison* v. *Arizona*, 481
U. S. 137 (1987), the Court allowed the defendants' death
sentences to stand where they did not themselves kill
the victims but their involvement in the events leading
up to the murders was active, recklessly indifferent, and
substantial.

In these cases the Court has been guided by "objective
indicia of society's standards, as expressed in legislative
enactments and state practice with respect to executions."
*Roper*, 543 U. S., at 563; see also *Coker*, *supra*, at 593–597
(plurality opinion) (finding that both legislatures and
juries had firmly rejected the penalty of death for the rape
of an adult woman); *Enmund*, *supra,* at 788 (looking to
"historical development of the punishment at issue, legis-
lative judgments, international opinion, and the sentenc-
ing decisions juries have made"). The inquiry does not end
there, however. Consensus is not dispositive. Whether
the death penalty is disproportionate to the crime commit-
ted depends as well upon the standards elaborated by
controlling precedents and by the Court's own understand-
ing and interpretation of the Eighth Amendment's text,
history, meaning, and purpose. See *id.,* at 797–801;
*Gregg*, *supra,* at 182–183 (joint opinion of Stewart, Powell,
and STEVENS, JJ.); *Coker*, *supra*, at 597–600 (plurality
opinion).

Based both on consensus and our own independent
judgment, our holding is that a death sentence for one who
raped but did not kill a child, and who did not intend to
assist another in killing the child, is unconstitutional
under the Eighth and Fourteenth Amendments.

### III
### A

The existence of objective indicia of consensus against making a crime punishable by death was a relevant concern in *Roper*, *Atkins*, *Coker*, and *Enmund*, and we follow the approach of those cases here. The history of the death penalty for the crime of rape is an instructive beginning point.

In 1925, 18 States, the District of Columbia, and the Federal Government had statutes that authorized the death penalty for the rape of a child or an adult. See *Coker, supra,* at 593 (plurality opinion). Between 1930 and 1964, 455 people were executed for those crimes. See 5 Historical Statistics of the United States: Earliest Times to the Present, pp. 5–262 to 5–263 (S. Carter et al. eds. 2006) (Table Ec343–357). To our knowledge the last individual executed for the rape of a child was Ronald Wolfe in 1964. See H. Frazier, Death Sentences in Missouri, 1803–2005: A History and Comprehensive Registry of Legal Executions, Pardons, and Commutations 143 (2006).

In 1972, *Furman* invalidated most of the state statutes authorizing the death penalty for the crime of rape; and in *Furman*'s aftermath only six States reenacted their capital rape provisions. Three States—Georgia, North Carolina, and Louisiana—did so with respect to all rape offenses. Three States—Florida, Mississippi, and Tennessee—did so with respect only to child rape. See *Coker, supra,* at 594–595 (plurality opinion). All six statutes were later invalidated under state or federal law. See *Coker*, *supra* (striking down Georgia's capital rape statute); *Woodson* v. *North Carolina*, 428 U. S. 280, 287, n. 6, 301–305 (1976) (plurality opinion) (striking down North Carolina's mandatory death penalty statute); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976) (striking down Louisiana's mandatory death penalty statute); *Collins* v. *State*, 550 S. W. 2d 643, 646 (Tenn.

1977) (striking down Tennessee's mandatory death penalty statute); *Buford* v. *State*, 403 So. 2d 943, 951 (Fla. 1981) (holding unconstitutional the imposition of death for child rape); *Leatherwood* v. *State*, 548 So. 2d 389, 402–403 (Miss. 1989) (striking down the death penalty for child rape on state-law grounds).

Louisiana reintroduced the death penalty for rape of a child in 1995. See La. Stat. Ann. §14:42 (West Supp. 1996). Under the current statute, any anal, vaginal, or oral intercourse with a child under the age of 13 constitutes aggravated rape and is punishable by death. See La. Stat. Ann. §14:42 (West Supp. 2007). Mistake of age is not a defense, so the statute imposes strict liability in this regard. Five States have since followed Louisiana's lead: Georgia, see Ga. Code Ann. §16–6–1 (2007) (enacted 1999); Montana, see Mont. Code Ann. §45–5–503 (2007) (enacted 1997); Oklahoma, see Okla. Stat., Tit. 10, §7115(K) (West 2007 Supp.) (enacted 2006); South Carolina, see S. C. Code Ann. §16–3–655(C)(1) (Supp. 2007) (enacted 2006); and Texas, see Tex. Penal Code Ann. §12.42(c)(3) (West Supp. 2007) (enacted 2007); see also Tex. Penal Code Ann. §22.021(a) (West Supp. 2007). Four of these States' statutes are more narrow than Louisiana's in that only offenders with a previous rape conviction are death eligible. See Mont. Code Ann. §45–5–503(3)(c); Okla. Stat., Tit. 10, §7115(K); S. C. Code Ann. §16–3–655(C)(1); Tex. Penal Code Ann. §12.42(c)(3). Georgia's statute makes child rape a capital offense only when aggravating circumstances are present, including but not limited to a prior conviction. See Ga. Code Ann. §17–10–30 (Supp. 2007).

By contrast, 44 States have not made child rape a capital offense. As for federal law, Congress in the Federal Death Penalty Act of 1994 expanded the number of federal crimes for which the death penalty is a permissible sentence, including certain nonhomicide offenses; but it did not do the same for child rape or abuse. See 108 Stat.

1972 (codified as amended in scattered sections of 18 U. S. C.). Under 18 U. S. C. §2245, an offender is death eligible only when the sexual abuse or exploitation results in the victim's death.

Petitioner claims the death penalty for child rape is not authorized in Georgia, pointing to a 1979 decision in which the Supreme Court of Georgia stated that "[s]tatutory rape is not a capital crime in Georgia." *Presnell* v. *State*, 243 Ga. 131, 132–133, 252 S. E. 2d 625, 626. But it appears *Presnell* was referring to the separate crime of statutory rape, which is not a capital offense in Georgia, see Ga. Code Ann. §26–2018 (1969); cf. Ga. Code. Ann. §16–6–3 (2007). The State's current capital rape statute, by contrast, is explicit that the rape of "[a] female who is less than ten years of age" is punishable "by death." Ga. Code Ann. §§16–6–1(a)(2), (b) (2007). Based on a recent statement by the Supreme Court of Georgia it must be assumed that this law is still in force: "Neither the United States Supreme Court, nor this Court, has yet addressed whether the death penalty is unconstitutionally disproportionate for the crime of raping a child." *State* v. *Velazquez*, 283 Ga. 206, 208, 657 S. E. 2d 838, 840 (2008).

Respondent would include Florida among those States that permit the death penalty for child rape. The state statute does authorize, by its terms, the death penalty for "sexual battery upon . . . a person less than 12 years of age." Fla. Stat. §794.011(2) (2007); see also §921.141(5) (2007). In 1981, however, the Supreme Court of Florida held the death penalty for child sexual assault to be unconstitutional. See *Buford, supra*. It acknowledged that *Coker* addressed only the constitutionality of the death penalty for rape of an adult woman, 403 So. 2d, at 950, but held that "[t]he reasoning of the justices in *Coker* . . . compels [the conclusion] that a sentence of death is grossly disproportionate and excessive punishment for the crime of sexual assault and is therefore forbidden by the Eighth

Amendment as cruel and unusual punishment," *id.,* at 951. Respondent points out that the state statute has not since been amended. Pursuant to Fla. Stat. §775.082(2) (2007), however, Florida state courts have understood *Buford* to bind their sentencing discretion in child rape cases. See, *e.g., Gibson* v. *State*, 721 So. 2d 363, 367, and n. 2 (Fla. App. 1998) (deeming it irrelevant that "the Florida Legislature never changed the wording of the sexual battery statute"); *Cooper* v. *State*, 453 So. 2d 67 (Fla. App. 1984) ("After *Buford*, death was no longer a possible penalty in Florida for sexual battery"); see also Fla. Stat. §775.082(2) ("In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court . . . the court having jurisdiction over a person previously sentenced to death for a capital felony . . . shall sentence such person to life imprisonment").

Definitive resolution of state-law issues is for the States' own courts, and there may be disagreement over the statistics. It is further true that some States, including States that have addressed the issue in just the last few years, have made child rape a capital offense. The summary recited here, however, does allow us to make certain comparisons with the data cited in the *Atkins*, *Roper,* and *Enmund* cases.

When *Atkins* was decided in 2002, 30 States, including 12 noncapital jurisdictions, prohibited the death penalty for mentally retarded offenders; 20 permitted it. See 536 U. S., at 313–315. When *Roper* was decided in 2005, the numbers disclosed a similar division among the States: 30 States prohibited the death penalty for juveniles, 18 of which permitted the death penalty for other offenders; and 20 States authorized it. See 543 U. S., at 564. Both in *Atkins* and in *Roper*, we noted that the practice of executing mentally retarded and juvenile offenders was infrequent. Only five States had executed an offender known to have an IQ below 70 between 1989 and 2002, see *At-*

*kins*, *supra,* at 316; and only three States had executed a juvenile offender between 1995 and 2005, see *Roper*, *supra,* at 564–565.

The statistics in *Enmund* bear an even greater similarity to the instant case. There eight jurisdictions had authorized imposition of the death penalty solely for participation in a robbery during which an accomplice committed murder, see 458 U. S., at 789, and six defendants between 1954 and 1982 had been sentenced to death for felony murder where the defendant did not personally commit the homicidal assault, *id.,* at 794. These facts, the Court concluded, "weigh[ed] on the side of rejecting capital punishment for the crime." *Id.,* at 793.

The evidence of a national consensus with respect to the death penalty for child rapists, as with respect to juveniles, mentally retarded offenders, and vicarious felony murderers, shows divided opinion but, on balance, an opinion against it. Thirty-seven jurisdictions—36 States plus the Federal Government—have the death penalty. As mentioned above, only six of those jurisdictions authorize the death penalty for rape of a child. Though our review of national consensus is not confined to tallying the number of States with applicable death penalty legislation, it is of significance that, in 45 jurisdictions, petitioner could not be executed for child rape of any kind. That number surpasses the 30 States in *Atkins* and *Roper* and the 42 States in *Enmund* that prohibited the death penalty under the circumstances those cases considered.

B

At least one difference between this case and our Eighth Amendment proportionality precedents must be addressed. Respondent and its *amici* suggest that some States have an "erroneous understanding of this Court's Eighth Amendment jurisprudence." Brief for Missouri Governor Matt Blunt et al. as *Amici Curiae* 10. They

submit that the general propositions set out in *Coker,* contrasting murder and rape, have been interpreted in too expansive a way, leading some state legislatures to conclude that *Coker* applies to child rape when in fact its reasoning does not, or ought not, apply to that specific crime.

This argument seems logical at first, but in the end it is unsound. In *Coker,* a four-Member plurality of the Court, plus Justice Brennan and Justice Marshall in concurrence, held that a sentence of death for the rape of a 16-year-old woman, who was a minor under Georgia law, see Ga. Code Ann. §74–104 (1973), yet was characterized by the Court as an adult, was disproportionate and excessive under the Eighth Amendment. See 433 U. S., at 593–600; see also *id.,* at 600 (Brennan, J., concurring in judgment); *ibid.* (Marshall, J., concurring in judgment). (The Court did not explain why the 16-year-old victim qualified as an adult, but it may be of some significance that she was married, had a home of her own, and had given birth to a son three weeks prior to the rape. See Brief for Petitioner in *Coker* v. *Georgia*, O. T. 1976, No. 75–5444, pp. 14–15.)

The plurality noted that only one State had a valid statute authorizing the death penalty for adult rape and that "in the vast majority of cases, at least 9 out of 10, juries ha[d] not imposed the death sentence." *Coker*, 433 U. S., at 597; see also *id.,* at 594 ("Of the 16 States in which rape had been a capital offense, only three provided the death penalty for rape of an adult woman in their revised statutes—Georgia, North Carolina, and Louisiana. In the latter two States, the death penalty was mandatory for those found guilty, and those laws were invalidated by *Woodson* and *Roberts*"). This "history and . . . objective evidence of the country's present judgment concerning the acceptability of death as a penalty for rape of an adult woman," *id.,* at 593, confirmed the Court's independent judgment that punishing adult rape by death was not

proportional:

> "Rape is without doubt deserving of serious pun-
> ishment; but in terms of moral depravity and of the
> injury to the person and to the public, it does not com-
> pare with murder, which does involve the unjustified
> taking of human life. Although it may be accompa-
> nied by another crime, rape by definition does not in-
> clude the death of . . . another person. The murderer
> kills; the rapist, if no more than that, does not. . . . We
> have the abiding conviction that the death penalty,
> which 'is unique in its severity and irrevocability,'
> *Gregg* v. *Georgia*, 428 U. S., at 187, is an excessive
> penalty for the rapist who, as such, does not take hu-
> man life." *Id.,* at 598 (footnote omitted).

Confined to this passage, *Coker*'s analysis of the Eighth
Amendment is susceptible of a reading that would prohibit
making child rape a capital offense. In context, however,
*Coker*'s holding was narrower than some of its language
read in isolation. The *Coker* plurality framed the question
as whether, "with respect to rape of an adult woman," the
death penalty is disproportionate punishment. *Id.,* at 592.
And it repeated the phrase "an adult woman" or "an adult
female" in discussing the act of rape or the victim of rape
eight times in its opinion. See *Coker, supra.* The distinc-
tion between adult and child rape was not merely rhetori-
cal; it was central to the Court's reasoning. The opinion
does not speak to the constitutionality of the death penalty
for child rape, an issue not then before the Court. In
discussing the legislative background, for example, the
Court noted:

> "Florida, Mississippi, and Tennessee also authorized
> the death penalty in some rape cases, but only where
> the victim was a child and the rapist an adult. The
> Tennessee statute has since been invalidated because
> the death sentence was mandatory. The upshot is

that Georgia is the sole jurisdiction in the United States at the present time that authorizes a sentence of death when the rape victim is an adult woman, and only two other jurisdictions provide capital punishment when the victim is a child. . . . [This] obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman." *Id.*, at 595–596 (citation and footnote omitted).

Still, respondent contends, it is possible that state legislatures have understood *Coker* to state a broad rule that covers the situation of the minor victim as well. We see little evidence of this. Respondent cites no reliable data to indicate that state legislatures have read *Coker* to bar capital punishment for child rape and, for this reason, have been deterred from passing applicable death penalty legislation. In the absence of evidence from those States where legislation has been proposed but not enacted we refuse to speculate about the motivations and concerns of particular state legislators.

The position of the state courts, furthermore, to which state legislators look for guidance on these matters, indicates that *Coker* has not blocked the emergence of legislative consensus. The state courts that have confronted the precise question before us have been uniform in concluding that *Coker* did not address the constitutionality of the death penalty for the crime of child rape. See, *e.g., Wilson*, 685 So. 2d, at 1066 (upholding the constitutionality of the death penalty for rape of a child and noting that "[t]he plurality [in *Coker*] took great pains in referring only to the rape of adult women throughout their opinion" (emphasis deleted)); *Upshaw* v. *State*, 350 So. 2d 1358, 1360 (Miss. 1977) ("In *Coker* the Court took great pains to limit its decision to the applicability of the death penalty for the rape of an adult woman. . . . As we view *Coker* the Court

carefully refrained from deciding whether the death penalty for the rape of a female child under the age of twelve years is grossly disproportionate to the crime"). See also *Simpson* v. *Owens*, 207 Ariz. 261, 268, n. 8, 85 P. 3d 478, 485, n. 8 (App. 2004) (addressing the denial of bail for sexual offenses against children and noting that "[a]lthough the death penalty was declared in a plurality opinion of the United States Supreme Court to be a disproportionate punishment for the rape of an adult woman . . . the rape of a child remains a capital offense in some states"); *People* v. *Hernandez*, 30 Cal. 4th 835, 869, 69 P. 3d 446, 466 (2003) (addressing the death penalty for conspiracy to commit murder and noting that "the constitutionality of laws imposing the death penalty for crimes not necessarily resulting in death is unresolved").

There is, to be sure, some contrary authority contained in various state-court opinions. But it is either dicta, see *State* v. *Barnum*, 921 So. 2d 513, 526 (Fla. 2005) (addressing the retroactivity of *Thompson* v. *State*, 695 So. 2d 691 (Fla. 1997)); *State* v. *Coleman*, 185 Mont. 299, 327, 605 P. 2d 1000, 1017 (1979) (upholding the defendant's death sentence for aggravated kidnaping); *State* v. *Gardner*, 947 P. 2d 630, 653 (Utah 1997) (addressing the constitutionality of the death penalty for prison assaults); equivocal in its conclusion, see *People* v. *Huddleston*, 212 Ill. 2d 107, 141, 816 N. E. 2d 322, 341–342 (2004) (citing law review articles for the proposition that the constitutionality of the death penalty for nonhomicide crimes "is the subject of debate"); or from a decision of a state intermediate court that has been superseded by a more specific statement of the law by the State's supreme court, compare, *e.g., Parker* v. *State*, 216 Ga. App. 649, 650, n. 1, 455 S. E. 2d 360, 361, n. 1 (1995) (characterizing *Coker* as holding that the death penalty "is no longer permitted for rape where the victim is not killed"), with *Velazquez*, 283 Ga., at 208, 657 S. E. 2d, at 840 ("[T]he United States Supreme Court . . . has

yet [to] addres[s] whether the death penalty is unconstitu-
tionally disproportionate for the crime of raping a child").

The Supreme Court of Florida's opinion in *Buford* could
be read to support respondent's argument. But even there
the state court recognized that "[t]he [Supreme] Court has
yet to decide whether [*Coker's* rationale] holds true for the
rape of a child" and made explicit that it was extending
the reasoning but not the holding of *Coker* in striking
down the death penalty for child rape. 403 So. 2d, at 950,
951. The same is true of the Supreme Court of California's
opinion in *Hernandez, supra,* at 867, 69 P. 3d, at 464.

We conclude on the basis of this review that there is no
clear indication that state legislatures have misinter-
preted *Coker* to hold that the death penalty for child rape
is unconstitutional. The small number of States that have
enacted this penalty, then, is relevant to determining
whether there is a consensus against capital punishment
for this crime.

C

Respondent insists that the six States where child rape
is a capital offense, along with the States that have pro-
posed but not yet enacted applicable death penalty legisla-
tion, reflect a consistent direction of change in support of
the death penalty for child rape. Consistent change might
counterbalance an otherwise weak demonstration of con-
sensus. See *Atkins*, 536 U. S., at 315 ("It is not so much
the number of these States that is significant, but the
consistency of the direction of change"); *Roper,* 543 U. S.,
at 565 ("Impressive in *Atkins* was the rate of abolition of
the death penalty for the mentally retarded"). But what-
ever the significance of consistent change where it is cited
to show emerging support for expanding the scope of the
death penalty, no showing of consistent change has been
made in this case.

Respondent and its *amici* identify five States where, in

their view, legislation authorizing capital punishment for child rape is pending. See Brief for Missouri Governor Matt Blunt et al. as *Amici Curiae* 2, 14. It is not our practice, nor is it sound, to find contemporary norms based upon state legislation that has been proposed but not yet enacted. There are compelling reasons not to do so here. Since the briefs were submitted by the parties, legislation in two of the five States has failed. See, *e.g.,* S. 195, 66th Gen. Assembly, 2d Reg. Sess. (Colo. 2008) (rejected by Senate Appropriations Committee on Apr. 11, 2008); S. 2596, 2008 Leg., Reg. Sess. (Miss. 2008) (rejected by House Committee on Mar. 18, 2008). In Tennessee, the house bills were rejected almost a year ago, and the senate bills appear to have died in committee. See H. R. 601, 105th Gen. Assembly, 1st Reg. Sess. (2007) (taken off Subcommittee Calendar on Apr. 4, 2007); H. R. 662, *ibid.* (failed for lack of second on Mar. 21, 2007); H. R. 1099, *ibid.* (taken off notice for Judiciary Committee calendar on May 16, 2007); S. 22, *ibid.* (referred to General Subcommittee of Senate Finance, Ways, and Means Committee on June 11, 2007); S. 157, *ibid.* (referred to Senate Judiciary Committee on Feb. 7, 2007; action deferred until Jan. 2008); S. 841, *ibid.* (referred to General Subcommittee of Senate Judiciary Committee on Mar. 27, 2007). In Alabama, the recent legislation is similar to a bill that failed in 2007. Compare H. R. 456, 2008 Leg., Reg. Sess. (2008), with H. R. 335, 2007 Leg., Reg. Sess. (2007). And in Missouri, the 2008 legislative session has ended, tabling the pending legislation. See Mo. Const., Art. III, §20(a).

Aside from pending legislation, it is true that in the last 13 years there has been change towards making child rape a capital offense. This is evidenced by six new death penalty statutes, three enacted in the last two years. But this showing is not as significant as the data in *Atkins*, where 18 States between 1986 and 2001 had enacted legislation prohibiting the execution of mentally retarded

persons. See *Atkins, supra,* at 313–315. Respondent argues the instant case is like *Roper* because, there, only five States had shifted their positions between 1989 and 2005, one less State than here. See *Roper, supra,* at 565. But in *Roper*, we emphasized that, though the pace of abolition was not as great as in *Atkins*, it was counterbalanced by the total number of States that had recognized the impropriety of executing juvenile offenders. See 543 U. S., at 566–567. When we decided *Stanford* v. *Kentucky*, 492 U. S. 361 (1989), 12 death penalty States already prohibited the execution of any juvenile under 18, and 15 prohibited the execution of any juvenile under 17. See *Roper*, *supra,* at 566–567 ("If anything, this shows that the impropriety of executing juveniles between 16 and 18 years of age gained wide recognition earlier"). Here, the total number of States to have made child rape a capital offense after *Furman* is six. This is not an indication of a trend or change in direction comparable to the one supported by data in *Roper*. The evidence here bears a closer resemblance to the evidence of state activity in *Enmund*, where we found a national consensus against the death penalty for vicarious felony murder despite eight jurisdictions having authorized the practice. See 458 U. S., at 789, 792.

## D

There are measures of consensus other than legislation. Statistics about the number of executions may inform the consideration whether capital punishment for the crime of child rape is regarded as unacceptable in our society. See, *e.g., id.*, at 794–795; *Roper*, *supra*, at 564–565; *Atkins*, *supra*, at 316; Cf. *Coker*, 433 U. S., at 596–597 (plurality opinion). These statistics confirm our determination from our review of state statutes that there is a social consensus against the death penalty for the crime of child rape.

Nine States—Florida, Georgia, Louisiana, Mississippi,

Montana, Oklahoma, South Carolina, Tennessee, and Texas—have permitted capital punishment for adult or child rape for some length of time between the Court's 1972 decision in *Furman* and today. See *supra,* at 12; *Coker*, *supra*, at 595 (plurality opinion). Yet no individual has been executed for the rape of an adult or child since 1964, and no execution for any other nonhomicide offense has been conducted since 1963. See Historical Statistics of the United States, at 5–262 to 5–263 (Table Ec343–357). Cf. *Thompson* v. *Oklahoma*, 487 U. S. 815, 852–853 (1988) (O'Connor, J., concurring in judgment) (that "four decades have gone by since the last execution of a defendant who was younger than 16 at the time of the offense . . . support[s] the inference of a national consensus opposing the death penalty for 15-year-olds").

Louisiana is the only State since 1964 that has sentenced an individual to death for the crime of child rape; and petitioner and Richard Davis, who was convicted and sentenced to death for the aggravated rape of a 5-year-old child by a Louisiana jury in December 2007, see *State* v. *Davis,* Case No. 262,971 (1st Jud. Dist., Caddo Parish, La.) (cited in Brief for Respondent 42, and n. 38), are the only two individuals now on death row in the United States for a nonhomicide offense.

After reviewing the authorities informed by contemporary norms, including the history of the death penalty for this and other nonhomicide crimes, current state statutes and new enactments, and the number of executions since 1964, we conclude there is a national consensus against capital punishment for the crime of child rape.

## IV

### A

As we have said in other Eighth Amendment cases, objective evidence of contemporary values as it relates to punishment for child rape is entitled to great weight, but

it does not end our inquiry. "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Coker*, *supra,* at 597 (plurality opinion); see also *Roper*, *supra*, at 563; *Enmund*, *supra*, at 797 ("[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty"). We turn, then, to the resolution of the question before us, which is informed by our precedents and our own understanding of the Constitution and the rights it secures.

It must be acknowledged that there are moral grounds to question a rule barring capital punishment for a crime against an individual that did not result in death. These facts illustrate the point. Here the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood. For this reason, we should be most reluctant to rely upon the language of the plurality in *Coker*, which posited that, for the victim of rape, "life may not be nearly so happy as it was" but it is not beyond repair. 433 U. S., at 598. Rape has a permanent psychological, emotional, and sometimes physical impact on the child. See C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2–24, 111–112 (1990); Finkelhor & Browne, Assessing the Long-Term Impact of Child Sexual Abuse: A Review and Conceptualization in Handbook on Sexual Abuse of Children 55–60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

It does not follow, though, that capital punishment is a proportionate penalty for the crime. The constitutional prohibition against excessive or cruel and unusual punishments mandates that the State's power to punish "be exercised within the limits of civilized standards." *Trop*,

356 U. S., at 99, 100 (plurality opinion). Evolving standards of decency that mark the progress of a maturing society counsel us to be most hesitant before interpreting the Eighth Amendment to allow the extension of the death penalty, a hesitation that has special force where no life was taken in the commission of the crime. It is an established principle that decency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment. See *id.,* at 100.

To date the Court has sought to define and implement this principle, for the most part, in cases involving capital murder. One approach has been to insist upon general rules that ensure consistency in determining who receives a death sentence. See *California* v. *Brown*, 479 U. S. 538, 541 (1987) ("[D]eath penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion" (citing *Gregg,* 428 U. S. 153; *Furman,* 408 U. S. 238)); *Godfrey* v. *Georgia*, 446 U. S. 420, 428 (1980) (plurality opinion) (requiring a State to give narrow and precise definition to the aggravating factors that warrant its imposition). At the same time the Court has insisted, to ensure restraint and moderation in use of capital punishment, on judging the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U. S., at 304 (plurality opinion); *Lockett* v. *Ohio*, 438 U. S. 586, 604–605 (1978) (plurality opinion).

The tension between general rules and case-specific circumstances has produced results not all together satisfactory. See *Tuilaepa* v. *California*, 512 U. S. 967, 973 (1994) ("The objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time"); *Walton* v. *Arizona*, 497 U. S. 639, 664–665 (1990) (SCALIA, J., concurring in part and concurring in

judgment) ("The latter requirement quite obviously de-stroys whatever rationality and predictability the former requirement was designed to achieve"). This has led some Members of the Court to say we should cease efforts to resolve the tension and simply allow legislatures, prosecu-tors, courts, and juries greater latitude. See *id.,* at 667–673 (advocating that the Court adhere to the *Furman* line of cases and abandon the *Woodson-Lockett* line of cases). For others the failure to limit these same imprecisions by stricter enforcement of narrowing rules has raised doubts concerning the constitutionality of capital punishment itself. See *Baze* v. *Rees*, 553 U. S. ___, ___–___ (2008) (slip op., at 13–17) (STEVENS, J., concurring in judgment); *Furman, supra*, at 310–314 (White, J., concurring); *Callins* v. *Collins*, 510 U. S. 1141, 1144–1145 (1994) (Blackmun, J., dissenting from denial of certiorari).

Our response to this case law, which is still in search of a unifying principle, has been to insist upon confining the instances in which capital punishment may be imposed. See *Gregg, supra*, at 187, 184 (joint opinion of Stewart, Powell, and STEVENS, JJ.) (because "death as a punish-ment is unique in its severity and irrevocability," capital punishment must be reserved for those crimes that are "so grievous an affront to humanity that the only adequate response may be the penalty of death" (citing in part *Furman*, 408 U. S., at 286–291 (Brennan, J., concurring); *id.,* at 306 (Stewart, J., concurring))); see also *Roper*, 543 U. S., at 569 (the Eighth Amendment requires that "the death penalty is reserved for a narrow category of crimes and offenders").

Our concern here is limited to crimes against individual persons. We do not address, for example, crimes defining and punishing treason, espionage, terrorism, and drug kingpin activity, which are offenses against the State. As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the

victim's life was not taken. We said in *Coker* of adult rape:

> "We do not discount the seriousness of rape as a crime. It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim . . . . Short of homicide, it is the 'ultimate violation of self.' . . . [But] [t]he murderer kills; the rapist, if no more than that, does not. . . . We have the abiding conviction that the death penalty, which 'is unique in its severity and irrevocability,' is an excessive penalty for the rapist who, as such, does not take human life." 433 U. S., at 597–598 (plurality opinion) (citation omitted).

The same distinction between homicide and other serious violent offenses against the individual informed the Court's analysis in *Enmund*, 458 U. S. 782, where the Court held that the death penalty for the crime of vicarious felony murder is disproportionate to the offense. The Court repeated there the fundamental, moral distinction between a "murderer" and a "robber," noting that while "robbery is a serious crime deserving serious punishment," it is not like death in its "severity and irrevocability." *Id.,* at 797 (internal quotation marks omitted).

Consistent with evolving standards of decency and the teachings of our precedents we conclude that, in determining whether the death penalty is excessive, there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons, even including child rape, on the other. The latter crimes may be devastating in their harm, as here, but "in terms of moral depravity and of the injury to the person and to the public," *Coker,* 433 U. S., at 598 (plurality opinion), they cannot be compared to murder in their "severity and irrevocability." *Ibid.*

In reaching our conclusion we find significant the num-

ber of executions that would be allowed under respondent's approach. The crime of child rape, considering its reported incidents, occurs more often than first-degree murder. Approximately 5,702 incidents of vaginal, anal, or oral rape of a child under the age of 12 were reported nationwide in 2005; this is almost twice the total incidents of intentional murder for victims of all ages (3,405) reported during the same period. See Inter-University Consortium for Political and Social Research, National Incident-Based Reporting System, 2005, Study No. 4720, http://www.icpsr.umich.edu (as visited June 12, 2008, and available in Clerk of Court's case file). Although we have no reliable statistics on convictions for child rape, we can surmise that, each year, there are hundreds, or more, of these convictions just in jurisdictions that permit capital punishment. Cf. Brief for Louisiana Association of Criminal Defense Lawyers et al. as *Amici Curiae* 1–2, and n. 2 (noting that there are now at least 70 capital rape indictments pending in Louisiana and estimating the actual number to be over 100). As a result of existing rules, see generally *Godfrey*, 446 U. S., at 428–433 (plurality opinion), only 2.2% of convicted first-degree murderers are sentenced to death, see Blume, Eisenberg, & Wells, Explaining Death Row's Population and Racial Composition, 1 J. of Empirical Legal Studies 165, 171 (2004). But under respondent's approach, the 36 States that permit the death penalty could sentence to death all persons convicted of raping a child less than 12 years of age. This could not be reconciled with our evolving standards of decency and the necessity to constrain the use of the death penalty.

It might be said that narrowing aggravators could be used in this context, as with murder offenses, to ensure the death penalty's restrained application. We find it difficult to identify standards that would guide the decisionmaker so the penalty is reserved for the most severe

cases of child rape and yet not imposed in an arbitrary way. Even were we to forbid, say, the execution of first-time child rapists, see *supra* at 12, or require as an aggravating factor a finding that the perpetrator's instant rape offense involved multiple victims, the jury still must balance, in its discretion, those aggravating factors against mitigating circumstances. In this context, which involves a crime that in many cases will overwhelm a decent person's judgment, we have no confidence that the imposition of the death penalty would not be so arbitrary as to be "freakis[h]," *Furman,* 408 U. S., at 310 (Stewart, J., concurring). We cannot sanction this result when the harm to the victim, though grave, cannot be quantified in the same way as death of the victim.

It is not a solution simply to apply to this context the aggravating factors developed for capital murder. The Court has said that a State may carry out its obligation to ensure individualized sentencing in capital murder cases by adopting sentencing processes that rely upon the jury to exercise wide discretion so long as there are narrowing factors that have some "'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Tuilaepa*, 512 U. S., at 975 (quoting *Jurek* v. *Texas*, 428 U. S. 262, 279 (1976) (White, J., concurring in judgment)). The Court, accordingly, has upheld the constitutionality of aggravating factors ranging from whether the defendant was a "'cold-blooded, pitiless slayer,'" *Arave* v. *Creech*, 507 U. S. 463, 471–474 (1993), to whether the "perpetrator inflict[ed] mental anguish or physical abuse before the victim's death," *Walton*, 497 U. S., at 654, to whether the defendant "'would commit criminal acts of violence that would constitute a continuing threat to society,'" *Jurek*, *supra*, at 269-270, 274–276 (joint opinion of Stewart, Powell, and STEVENS, JJ.). All of these standards have the potential to result in some inconsistency of application.

As noted above, the resulting imprecision and the ten-sion between evaluating the individual circumstances and consistency of treatment have been tolerated where the victim dies.  It should not be introduced into our justice system, though, where death has not occurred.

Our concerns are all the more pronounced where, as here, the death penalty for this crime has been most infre-quent.  See Part III–D, *supra.*  We have developed a foun-dational jurisprudence in the case of capital murder to guide the States and juries in imposing the death penalty. Starting with *Gregg,* 428 U. S. 153, we have spent more than 32 years articulating limiting factors that channel the jury's discretion to avoid the death penalty's arbitrary imposition in the case of capital murder.  Though that practice remains sound, beginning the same process for crimes for which no one has been executed in more than 40 years would require experimentation in an area where a failed experiment would result in the execution of indi-viduals undeserving of the death penalty.  Evolving stan-dards of decency are difficult to reconcile with a regime that seeks to expand the death penalty to an area where standards to confine its use are indefinite and obscure.

## B

Our decision is consistent with the justifications offered for the death penalty.  *Gregg* instructs that capital pun-ishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social pur-poses served by the death penalty: retribution and deter-rence of capital crimes.  See *id.,* at 173, 183, 187 (joint opinion of Stewart, Powell, and STEVENS, JJ.); see also *Coker,* 433 U. S., at 592 (plurality opinion) ("A punishment might fail the test on either ground").

As in *Coker*, here it cannot be said with any certainty that the death penalty for child rape serves no deterrent or retributive function.  See *id.,* at 593, n. 4 (concluding

that the death penalty for rape might serve "legitimate ends of punishment" but nevertheless is disproportionate to the crime). Cf. *Gregg, supra*, at 185–186 (joint opinion of Stewart, Powell, and STEVENS, JJ.) ("[T]here is no convincing empirical evidence either supporting or refuting th[e] view [that the death penalty serves as a significantly greater deterrent than lesser penalties]. We may nevertheless assume safely that there are murderers . . . for whom . . . the death penalty undoubtedly is a significant deterrent"); *id.,* at 186 (the value of capital punishment, and its contribution to acceptable penological goals, typically is a "complex factual issue the resolution of which properly rests with the legislatures"). This argument does not overcome other objections, however. The incongruity between the crime of child rape and the harshness of the death penalty poses risks of overpunishment and counsels against a constitutional ruling that the death penalty can be expanded to include this offense.

The goal of retribution, which reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused, see *Atkins*, 536 U. S., at 319; *Furman, supra*, at 308 (Stewart, J., concurring), does not justify the harshness of the death penalty here. In measuring retribution, as well as other objectives of criminal law, it is appropriate to distinguish between a particularly depraved murder that merits death as a form of retribution and the crime of child rape. See Part IV–A, *supra*; *Coker, supra,* at 597–598 (plurality opinion).

There is an additional reason for our conclusion that imposing the death penalty for child rape would not further retributive purposes. In considering whether retribution is served, among other factors we have looked to whether capital punishment "has the potential . . . to allow the community as a whole, including the surviving family and friends of the victim, to affirm its own judgment that the culpability of the prisoner is so serious that the ulti-

mate penalty must be sought and imposed." *Panetti* v. *Quarterman*, 551 U. S. ___, ____ (2007) (slip op., at 26). In considering the death penalty for nonhomicide offenses this inquiry necessarily also must include the question whether the death penalty balances the wrong to the victim. Cf. *Roper,* 543 U. S., at 571.

It is not at all evident that the child rape victim's hurt is lessened when the law permits the death of the perpetrator. Capital cases require a long-term commitment by those who testify for the prosecution, especially when guilt and sentencing determinations are in multiple proceedings. In cases like this the key testimony is not just from the family but from the victim herself. During formative years of her adolescence, made all the more daunting for having to come to terms with the brutality of her experience, L. H. was required to discuss the case at length with law enforcement personnel. In a public trial she was required to recount once more all the details of the crime to a jury as the State pursued the death of her stepfather. Cf. G. Goodman et al., Testifying in Criminal Court: Emotional Effects on Child Sexual Assault Victims 50, 62, 72 (1992); Brief for National Association of Social Workers et al. as *Amici Curiae* 17–21. And in the end the State made L. H. a central figure in its decision to seek the death penalty, telling the jury in closing statements: "[L. H.] is asking you, asking you to set up a time and place when he dies." Tr. 121 (Aug. 26, 2003).

Society's desire to inflict the death penalty for child rape by enlisting the child victim to assist it over the course of years in asking for capital punishment forces a moral choice on the child, who is not of mature age to make that choice. The way the death penalty here involves the child victim in its enforcement can compromise a decent legal system; and this is but a subset of fundamental difficulties capital punishment can cause in the administration and enforcement of laws proscribing child rape.

   There are, moreover, serious systemic concerns in prose-cuting the crime of child rape that are relevant to the constitutionality of making it a capital offense. The prob-lem of unreliable, induced, and even imagined child testi-mony means there is a "special risk of wrongful execution" in some child rape cases. *Atkins*, *supra*, at 321. See also Brief for National Association of Criminal Defense Law-yers et al. as *Amici Curiae* 5–17. This undermines, at least to some degree, the meaningful contribution of the death penalty to legitimate goals of punishment. Studies conclude that children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement. See Ceci & Friedman, The Suggestibility of Children: Scientific Research and Legal Implications, 86 Cornell L. Rev. 33, 47 (2000) (there is "strong evidence that children, especially young children, are suggestible to a significant degree—even on abuse-related questions"); Gross, Jacoby, Matheson, Montgom-ery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J. Crim. L. & C. 523, 539 (2005) (dis-cussing allegations of abuse at the Little Rascals Day Care Center); see also Quas, Davis, Goodman, & Myers, Re-peated Questions, Deception, and Children's True and False Reports of Body Touch, 12 Child Maltreatment 60, 61–66 (2007) (finding that 4- to 7-year-olds "were able to maintain [a] lie about body touch fairly effectively when asked repeated, direct questions during a mock forensic interview").

   Similar criticisms pertain to other cases involving child witnesses; but child rape cases present heightened con-cerns because the central narrative and account of the crime often comes from the child herself. She and the accused are, in most instances, the only ones present when the crime was committed. See *Pennsylvania* v. *Ritchie*, 480 U. S. 39, 60 (1987). Cf. Goodman, Testifying in Criminal Court, at 118. And the question in a capital case

is not just the fact of the crime, including, say, proof of rape as distinct from abuse short of rape, but details bearing upon brutality in its commission. These matters are subject to fabrication or exaggeration, or both. See Ceci and Friedman, *supra;* Quas, *supra.* Although capital punishment does bring retribution, and the legislature here has chosen to use it for this end, its judgment must be weighed, in deciding the constitutional question, against the special risks of unreliable testimony with respect to this crime.

With respect to deterrence, if the death penalty adds to the risk of non-reporting, that, too, diminishes the penalty's objectives. Underreporting is a common problem with respect to child sexual abuse. See Hanson, Resnick, Saunders, Kilpatrick, & Best, Factors Related to the Reporting of Childhood Rape, 23 Child Abuse & Neglect 559, 564 (1999) (finding that about 88% of female rape victims under the age of 18 did not disclose their abuse to authorities); Smith et al., Delay in Disclosure of Childhood Rape: Results From A National Survey, 24 Child Abuse & Neglect 273, 278–279 (2000) (finding that 72% of women raped as children disclosed their abuse to someone, but that only 12% of the victims reported the rape to authorities). Although we know little about what differentiates those who report from those who do not report, see Hanson, *supra*, at 561, one of the most commonly cited reasons for nondisclosure is fear of negative consequences for the perpetrator, a concern that has special force where the abuser is a family member, see Goodman-Brown, Edelstein, Goodman, Jones, & Gordon, Why Children Tell: A Model of Children's Disclosure of Sexual Abuse, 27 Child Abuse & Neglect 525, 527–528 (2003); Smith, *supra,* at 283–284 (finding that, where there was a relationship between perpetrator and victim, the victim was likely to keep the abuse a secret for a longer period of time, perhaps because of a "greater sense of loyalty or emotional

bond"); Hanson, *supra*, at 565–566, and Table 3 (finding that a "significantly greater proportion of reported than nonreported cases involved a stranger"); see also *Ritchie*, *supra,* at 60. The experience of the *amici* who work with child victims indicates that, when the punishment is death, both the victim and the victim's family members may be more likely to shield the perpetrator from discovery, thus increasing underreporting. See Brief for National Association of Social Workers et al. as *Amici Curiae* 11–13. As a result, punishment by death may not result in more deterrence or more effective enforcement.

In addition, by in effect making the punishment for child rape and murder equivalent, a State that punishes child rape by death may remove a strong incentive for the rapist not to kill the victim. Assuming the offender behaves in a rational way, as one must to justify the penalty on grounds of deterrence, the penalty in some respects gives less protection, not more, to the victim, who is often the sole witness to the crime. See Rayburn, Better Dead Than R(ap)ed?: The Patriarchal Rhetoric Driving Capital Rape Statutes, 78 St. John's L. Rev. 1119, 1159–1160 (2004). It might be argued that, even if the death penalty results in a marginal increase in the incentive to kill, this is counterbalanced by a marginally increased deterrent to commit the crime at all. Whatever balance the legislature strikes, however, uncertainty on the point makes the argument for the penalty less compelling than for homicide crimes.

Each of these propositions, standing alone, might not establish the unconstitutionality of the death penalty for the crime of child rape. Taken in sum, however, they demonstrate the serious negative consequences of making child rape a capital offense. These considerations lead us to conclude, in our independent judgment, that the death penalty is not a proportional punishment for the rape of a child.

## V

Our determination that there is a consensus against the death penalty for child rape raises the question whether the Court's own institutional position and its holding will have the effect of blocking further or later consensus in favor of the penalty from developing. The Court, it will be argued, by the act of addressing the constitutionality of the death penalty, intrudes upon the consensus-making process. By imposing a negative restraint, the argument runs, the Court makes it more difficult for consensus to change or emerge. The Court, according to the criticism, itself becomes enmeshed in the process, part judge and part the maker of that which it judges.

These concerns overlook the meaning and full substance of the established proposition that the Eighth Amendment is defined by "the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U. S., at 101 (plurality opinion). Confirmed by repeated, consistent rulings of this Court, this principle requires that use of the death penalty be restrained. The rule of evolving standards of decency with specific marks on the way to full progress and mature judgment means that resort to the penalty must be reserved for the worst of crimes and limited in its instances of application. In most cases justice is not better served by terminating the life of the perpetrator rather than confining him and preserving the possibility that he and the system will find ways to allow him to understand the enormity of his offense. Difficulties in administering the penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use, at this stage of evolving standards and in cases of crimes against individuals, for crimes that take the life of the victim.

The judgment of the Supreme Court of Louisiana upholding the capital sentence is reversed. This case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 07–343

————

## PATRICK KENNEDY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[June 25, 2008]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE
SCALIA, and JUSTICE THOMAS join, dissenting.

The Court today holds that the Eighth Amendment
categorically prohibits the imposition of the death penalty
for the crime of raping a child. This is so, according to the
Court, no matter how young the child, no matter how
many times the child is raped, no matter how many chil-
dren the perpetrator rapes, no matter how sadistic the
crime, no matter how much physical or psychological
trauma is inflicted, and no matter how heinous the perpe-
trator's prior criminal record may be. The Court provides
two reasons for this sweeping conclusion: First, the Court
claims to have identified "a national consensus" that the
death penalty is never acceptable for the rape of a child;
second, the Court concludes, based on its "independent
judgment," that imposing the death penalty for child rape
is inconsistent with "'the evolving standards of decency
that mark the progress of a maturing society.'" *Ante*, at 8,
15, 16 (citation omitted). Because neither of these justifi-
cations is sound, I respectfully dissent.

## I

### A

I turn first to the Court's claim that there is "a national
consensus" that it is never acceptable to impose the death
penalty for the rape of a child. The Eighth Amendment's

requirements, the Court writes, are "determined not by the standards that prevailed" when the Amendment was adopted but "by the norms that 'currently prevail.'" *Ante*, at 8 (quoting *Atkins* v. *Virginia*, 536 U. S. 304, 311 (2002)). In assessing current norms, the Court relies primarily on the fact that only 6 of the 50 States now have statutes that permit the death penalty for this offense. But this statistic is a highly unreliable indicator of the views of state lawmakers and their constituents. As I will explain, dicta in this Court's decision in *Coker* v. *Georgia*, 433 U. S. 584 (1977), has stunted legislative consideration of the question whether the death penalty for the targeted offense of raping a young child is consistent with prevailing standards of decency. The *Coker* dicta gave state legislators and others good reason to fear that any law permitting the imposition of the death penalty for this crime would meet precisely the fate that has now befallen the Louisiana statute that is currently before us, and this threat strongly discouraged state legislators—regardless of their own values and those of their constituents—from supporting the enactment of such legislation.

As the Court correctly concludes, the *holding* in *Coker* was that the Eighth Amendment prohibits the death penalty for the rape of an "'adult woman,'" and thus *Coker* does not control our decision here. See *ante,* at 17. But the reasoning of the Justices in the majority had broader implications.

Two Members of the *Coker* majority, Justices Brennan and Marshall, took the position that the death penalty is always unconstitutional. 433 U. S., at 600 (Brennan, J., concurring in judgment) and (Marshall, J., concurring in judgment). Four other Justices, who joined the controlling plurality opinion, suggested that the Georgia capital rape statute was unconstitutional for the simple reason that the impact of a rape, no matter how heinous, is not grievous enough to justify capital punishment. In the words of

the plurality: "Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair." *Id.,* at 598. The plurality summarized its position as follows: "We have the abiding conviction that the death penalty . . . is an excessive penalty for the rapist who, as such, does not take human life." *Ibid.*

The implications of the *Coker* plurality opinion were plain. Justice Powell, who concurred in the judgment overturning the death sentence in the case at hand, did not join the plurality opinion because he understood it to draw "a bright line between murder and all rapes— regardless of the degree of brutality of the rape or the effect upon the victim." *Id.*, at 603. If Justice Powell read *Coker* that way, it was reasonable for state legislatures to do the same.

Understandably, state courts have frequently read *Coker* in precisely this way. The Court is correct that state courts have generally understood the limited scope of the *holding* in *Coker, ante,* at 18, but lower courts and legislators also take into account—and I presume that this Court wishes them to continue to take into account—the Court's dicta. And that is just what happened in the wake of *Coker*. Four years after *Coker,* when Florida's capital child rape statute was challenged, the Florida Supreme Court, while correctly noting that this Court had not *held* that the Eighth Amendment bars the death penalty for child rape, concluded that "[t]he reasoning of the justices in *Coker v. Georgia* compels us to hold that a sentence of death is grossly disproportionate and excessive punishment for the crime of sexual assault and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment." *Buford* v. *State*, 403 So. 2d 943, 951 (1981).

Numerous other state courts have interpreted the *Coker* dicta similarly. See *State* v. *Barnum*, 921 So. 2d 513, 526 (Fla. 2005) (citing *Coker* as holding that "'a sentence of

death is grossly disproportionate and excessive punishment for the crime of rape,'" not merely the rape of an adult woman); *People* v. *Huddleston*, 212 Ill. 2d. 107, 141, 816 N. E. 2d 322, 341 (2004) (recognizing that "the constitutionality of state statutes that impose the death penalty for nonhomicide crimes is the subject of debate" after *Coker*); *People* v. *Hernandez*, 30 Cal. 4th 835, 867, 69 P. 3d 446, 464–467 (2003) (*Coker* "rais[ed] serious doubts that the federal Constitution permitted the death penalty for any offense not requiring the actual taking of human life" because "[a]lthough the high court did not expressly hold [in *Coker*] that the Eighth Amendment prohibits capital punishment for *all* crimes not resulting in death, the plurality stressed that the crucial difference between rape and murder is that a rapist 'does not take human life'"); *State* v. *Gardner*, 947 P. 2d 630, 653 (Utah 1997) ("The *Coker* holding leaves no room for the conclusion that any rape, even an 'inhuman' one involving torture and aggravated battery but not resulting in death, would constitutionally sustain imposition of the death penalty"); *Parker* v. *State*, 216 Ga. App. 649, n. 1, 455 S. E. 2d 360, 361, n. 1 (1995) (citing *Coker* for the proposition that the death penalty "is no longer permitted for rape where the victim is not killed"); *Leatherwood* v. *State*, 548 So. 2d 389, 406 (Miss. 1989) (Robertson, J., concurring) ("There is as much chance of the Supreme Court sanctioning death as a penalty for *any* non-fatal rape as the proverbial snowball enjoys in the nether regions"); *State* v. *Coleman*, 185 Mont. 299, 327–328, 605 P. 2d 1000, 1017 (1979) (stating that "[t]he decision of the Court in *Coker* v. *Georgia* is relevant only to crimes for which the penalty has been imposed which did *not* result in the loss of a life" (citations omitted)); *Boyer* v. *State*, 240 Ga. 170, 240 S. E. 2d 68 (1977) *(per curiam)* (stating that "[s]ince death to the victim did not result . . . the death penalty for rape must be set aside"); see also 2005–1981 (La. Sup. Ct. 5/22/07), 957 So.

2d 757, 794 (case below) (Calogero, C. J., dissenting) (citing the comments of the *Coker* plurality and concluding that the Louisiana child rape law cannot pass constitutional muster).[1]

For the past three decades, these interpretations have posed a very high hurdle for state legislatures considering the passage of new laws permitting the death penalty for the rape of a child. The enactment and implementation of any new state death penalty statute—and particularly a new type of statute such as one that specifically targets the rape of young children—imposes many costs. There is

———————

[1] Commentators have expressed similar views. See Fleming, Louisiana's Newest Capital Crime: The Death Penalty for Child Rape, 89 J. Crim. L. & C. 717, 727 (1999) (the *Coker* Court drew a line between "crimes which result in loss of life, and crimes which do not"); Baily, Death is Different, Even on the Bayou: The Disproportionality of Crime, 55 Wash. & Lee L. Rev. 1335, 1357 (1998) (noting that "[m]any post-Coker cases interpreting the breadth of *Coker*'s holding suggest that the Mississippi Supreme Court's narrow reading of *Coker* in Upshaw is a minority position"); Matura, When Will It Stop? The Use of the Death Penalty for Non-homicide Crimes, 24 J. Legis. 249, 255 (1998) (stating that the *Coker* Court did not "draw a distinction between the rape of an adult woman and the rape of a minor"); Garvey, "As the Gentle Rain from Heaven": Mercy in Capital Sentencing, 81 Cornell L. Rev. 989, 1009, n. 74 (1996) (stating that courts generally understand *Coker* to prohibit death sentences for crimes other than murder); Nanda, Recent Developments in the United States and Internationally Regarding Capital Punishment—An Appraisal, 67 St. John's L. Rev. 523, 532 (1993) (finding that *Coker* stands for the proposition that a death sentence is excessive when the victim is not killed); Ellis, Guilty but Mentally Ill and the Death Penalty: Punishment Full of Sound and Fury, Signifying Nothing, 43 Duke L. J. 87, 94 (1994) (referencing *Coker* to require capital offenses to be defined by unjustified human death); Dingerson, Reclaiming the Gavel: Making Sense out of the Death Penalty Debate in State Legislatures, 18 N. Y. U. Rev. L. & Soc. Change 873, 878 (1991) (stating that *Coker* "ruled that the imposition of the death penalty for crimes from which no death results violates the cruel and unusual punishment provision of the eighth amendment" and that "[n]o subsequent Supreme Court decision has challenged this precedent").

the burden of drafting an innovative law that must take
into account this Court's exceedingly complex Eighth
Amendment jurisprudence.  Securing passage of contro-
versial legislation may interfere in a variety of ways with
the enactment of other bills on the legislative agenda.
Once the statute is enacted, there is the burden of training
and coordinating the efforts of those who must implement
the new law.  Capital prosecutions are qualitatively more
difficult than noncapital prosecutions and impose special
emotional burdens on all involved.  When a capital sen-
tence is imposed under the new law, there is the burden of
keeping the prisoner on death row and the lengthy and
costly project of defending the constitutionality of the
statute on appeal and in collateral proceedings.  And if the
law is eventually overturned, there is the burden of new
proceedings on remand.  Moreover, conscientious state
lawmakers, whatever their personal views about the
morality of imposing the death penalty for child rape, may
defer to this Court's dicta, either because they respect our
authority and expertise in interpreting the Constitution or
merely because they do not relish the prospect of being
held to have violated the Constitution and contravened
prevailing "standards of decency."  Accordingly, the *Coker*
dicta gave state legislators a strong incentive not to push
for the enactment of new capital child-rape laws even
though these legislators and their constituents may have
believed that the laws would be appropriate and desirable.

### B

The Court expresses doubt that the *Coker* dicta had this
effect, but the skepticism is unwarranted.  It would be
quite remarkable if state legislators were not influenced
by the considerations noted above.  And although state
legislatures typically do not create legislative materials
like those produced by Congress, there is evidence that
proposals to permit the imposition of the death penalty for

child rape were opposed on the ground that enactment would be futile and costly.

In Oklahoma, the opposition to the State's capital child-rape statute argued that *Coker* had already ruled the death penalty unconstitutional as applied to cases of rape. See Oklahoma Senate News Release, Senator Nichols Targets Child Predators with Death Penalty, Child Abuse Response Team, May 26, 2006, on line at http://www.oksenate.gov/news/press_releases/press_releases_ 2006/pr20060526d.htm (all Internet materials as visited June 23, 2008, and available in Clerk of Court's case file). Likewise, opponents of South Carolina's capital child-rape law contended that the statute would waste state resources because it would undoubtedly be held unconstitutional. See The State, Death Penalty Plan in Spotlight: Attorney General to Advise Senate Panel on Proposal for Repeat Child Rapists, Mar. 28, 2006 (quoting Laura Hudson, spokeswoman for the S. C. Victim Assistance Network, as stating that "'[w]e don't need to be wasting state money to have an appeal to the [United States] Supreme Court, knowing we are going to lose it'"). Representative Fletcher Smith of the South Carolina House of Representatives forecast that the bill would not meet constitutional standards because "death isn't involved." See Davenport, Emotion Drives Child Rape Death Penalty Debate in South Carolina, Associated Press, Apr. 4, 2006.

In Texas, opponents of that State's capital child-rape law argued that *Coker*'s reasoning doomed the proposal. House Research Organization Bill Analysis, Mar. 5, 2007 (stating that "the law would impose an excessive punishment and fail to pass the proportionality test established by the U. S. Supreme Court" and arguing that "Texas should not enact a law of questionable constitutionality simply because it is politically popular, especially given clues by the U. S. Supreme Court that death penalty laws that would be rarely imposed or that are not sup-

ported by a broad national consensus would be ruled unconstitutional").

## C

Because of the effect of the *Coker* dicta, the Court is plainly wrong in comparing the situation here to that in *Atkins* or *Roper* v. *Simmons*, 543 U. S. 551 (2005). See *ante*, at 14–15. *Atkins* concerned the constitutionality of imposing the death penalty on a mentally retarded defendant. Thirteen years earlier, in *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), the Court had held that this was permitted by the Eighth Amendment, and therefore, during the time between *Penry* and *Atkins,* state legislators had reason to believe that this Court would follow its prior precedent and uphold statutes allowing such punishment.

The situation in *Roper* was similar. *Roper* concerned a challenge to the constitutionality of imposing the death penalty on a defendant who had not reached the age of 18 at the time of the crime. Sixteen years earlier in *Stanford* v. *Kentucky*, 492 U. S. 361 (1989), the Court had rejected a similar challenge, and therefore state lawmakers had cause to believe that laws allowing such punishment would be sustained.

When state lawmakers believe that their decision will prevail on the question whether to permit the death penalty for a particular crime or class of offender, the legislators' resolution of the issue can be interpreted as an expression of their own judgment, informed by whatever weight they attach to the values of their constituents. But when state legislators think that the enactment of a new death penalty law is likely to be futile, inaction cannot reasonably be interpreted as an expression of their understanding of prevailing societal values. In that atmosphere, legislative inaction is more likely to evidence acquiescence.

## D

If anything can be inferred from state legislative developments, the message is very different from the one that the Court perceives. In just the past few years, despite the shadow cast by the *Coker* dicta, five States have enacted targeted capital child-rape laws. See Ga. Code Ann. §16–6–1 (1999); Mont. Code Ann. §45–5–503 (1997); Okla. Stat., Tit. 10, §7115(K) (West Supp. 2008); S. C. Code Ann. §16–3–655(C)(1) (Supp. 2007); Tex. Penal Code Ann. §§22.021(a), 12.42(c)(3) (West Supp. 2007). If, as the Court seems to think, our society is "[e]volving" toward ever higher "standards of decency," *ante*, at 36, these enactments might represent the beginning of a new evolutionary line.

Such a development would not be out of step with changes in our society's thinking since *Coker* was decided. During that time, reported instances of child abuse have increased dramatically;[2] and there are many indications of growing alarm about the sexual abuse of children. In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U. S. C. §14071 (2000 ed. and Supp. V),

––––––––––

[2] From 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2,100%. A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Sep Fed. Probation 69 (1995). By 1991, the number of cases totaled 432,000, an increase of another 227%. *Ibid.* In 1995, local child protection services agencies identified 126,000 children who were victims of either substantiated or indicated sexual abuse. Nearly 30% of those child victims were between the age of four and seven. Rape, Abuse & Incest National Network Statistics, online at http://www.rainn.org/get-information/statistics/sexual-assault-victims. There were an estimated 90,000 substantiated cases of child sexual abuse in 2003. Crimes Against Children Research Center, Reports from the States to the National Child Abuse and Neglect Data System, available at www.unh.edu/ccrc/sexual-abuse/Child%20Sexual%20Abuse.pdf.

which requires States receiving certain federal funds to
establish registration systems for convicted sex offenders
and to  notify the public about persons convicted of the
sexual abuse of minors.  All 50 States have now enacted
such statutes.[3]   In addition, at least 21 States and the

_____

[3] Ala. Code §§13A–11–200 to 13A–11–203, 1181 (1994); Alaska Stat
§§1.56.840, 12.63.010–100, 18.65.087, 28.05.048, 33.30.035 (1994, 1995,
and 1995 Cum. Supp.); Ariz. Rev. Stat. Ann. §§13–3821 to –3825 (1989
and Supp. 1995); Ark. Code Ann. §§12–12–901 to –909 (1995); Cal.
Penal Code Ann. §§290 to 290.4 (West Supp. 1996); Colo. Rev. Stat.
Ann. §18–3–412.5 (Supp. 1996); Conn. Gen. Stat. Ann. §§54–102a to
54–102r (Supp. 1995); Del. Code Ann. Tit. 11, §4120 (1995); Fla. Stat.
Ann. §§775.13, 775.22 (1992 and Supp. 1994); Ga. Code Ann. §42–9–
44.1 (1994); 1995 Haw. Sess. Laws No. 160 (enacted June 14, 1995);
Idaho Code §§9–340(11)(f), 18–8301 to 18–8311 (Supp. 1995); Ill. Comp.
Stat. Ann., ch. 730, §§150/1 to 150/10 (2002); Ind. Code §§5–2–12–1 to
5–2–12–13 (West Supp. 1995); 1995 Iowa Legis. Serv. 146 (enacted May
3, 1995); Kan. Stat. Ann. §§22–4901 to 22–4910 (1995); Ky. Rev. Stat.
Ann. §§17.500 to 17.540 (West Supp. 1994); La. Stat. Ann. §§15:540 to
15:549 (West Supp. 1995); Me. Rev. Stat. Ann., Tit. 34–A, §§11001 to
11004 (West Supp. 1995); 1995 Md. Laws p. 142 (enacted May 9, 1995);
Mass. Gen. Laws Ann., ch. 6, §178D; 1994 Mich. Pub. Acts p. 295
(enacted July 13, 1994); Minn. Stat. §243.166 (1992 and Supp. 1995);
Miss. Code Ann. §§45–33–1 to 45–33–19 (Supp. 1995); Mo. Rev. Stat.
§§566.600 to 566.625 (Supp. 1996); Mont. Code Ann. §§46–23–501 to
46–23–507 (1994); Neb. Rev. Stat. §§4001 to 4014; Nev. Rev. Stat.
§§207.080, 207.151 to 207.157 (1992 and Supp. 1995); N. H. Rev. Stat.
Ann. §§632–A:11 to 632–A:19 (Supp. 1995); N. J. Stat. Ann. §§2c:7–1 to
2c:7–11 (1995); N. M. Stat. Ann. §§29–11A–1 to 29–11A–8 (Supp. 1995);
N. Y. Correct. Law Ann. §§168 to 168–V (West Supp. 1996); N. C. Gen.
Stat. Ann. §§14–208.5–10 (Lexis Supp. 1995); N. D. Cent. Code §12.1–
32–15 (Lexis Supp. 1995); Ohio Rev. Code Ann. §§2950.01–.08 (Baldwin
1997); Okla. Stat., Tit. 57, §§582–584 (2003 Supp.); Ore. Rev. Stat.
§§181.507 to 181.519 (1993); 1995 Pa. Laws p. 24 (enacted Oct. 24,
1995); R. I. Gen. Laws §11–37–16 (1994); S. C. Code Ann. §23–3–430;
S. D. Codified Laws §§22–22–30 to 22–22–41 (Supp. 1995) Tenn. Code
Ann. §§40–39–101 to 40–39–108 (2003); Tex. Rev. Civ. Stat. Ann., Art.
6252–13c.1 (Vernon Supp. 1996); Utah Code Ann. §§53–5–212.5, 77–
27–21.5 (Lexis Supp. 1995); Vt. Stat. Ann., Tit. 13, §5402; Va. Code
Ann. §§19.2–298.1 to 19.2–390.1 (Lexis 1995); Wash. Rev. Code
§§4.24.550, 9A.44.130, 9A.44.140, 10.01.200, 70.48.470, 72.09.330 (1992

ALITO, J., dissenting

District of Columbia now have statutes permitting the involuntary commitment of sexual predators,[4] and at least 12 States have enacted residency restrictions for sex offenders.[5]

———————

and Supp. 1996); W. Va. Code §§61–8F–1 to 61–8F–8 (Lexis Supp. 1995); Wis. Stat. §175.45 (Supp. 1995); Wyo. Stat. Ann. §§7–19–301 to 7–19–306 (1995).

[4] Those States are Arizona, California, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Kansas, Kentucky, Massachusetts, Minnesota, Missouri, Nebraska, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Wisconsin. See Ariz. Rev. Stat. §§36–3701 to 36–3713 (West 2003 and Supp. 2007); Cal. Welf. & Inst. Code Ann. §§6600 to 6609.3 (West 1998 and Supp. 2008); Conn. Gen. Stat. §17a–566 (1998); D. C. Code §§22–3803 to 22–3811 (2001); Fla. Stat. §§394.910 to 394.931 (West 2002 and Supp. 2005); Ill. Comp. Stat., ch. 725, §§207/1 to 207/99 (2002); Iowa Code §§229A.1–.16 (Supp. 2005); Kan. Stat. Ann. §59–29a02 (2004 and Supp. 2005); Ky. Rev. Stat. Ann. §202A.051 (West \_\_\_); Mass. Gen. Laws, ch. 123A (1989); Minn. Stat. §253B.02 (1992); Mo. Ann. Stat. §§632.480 to 632.513 (West 2000 and Supp. 2006); Neb. Rev. Stat. §§83–174 to 83–174.05 (2007); N. J. Stat. Ann. §§30:4–27.24 to 30:4–27.38 (West Supp. 2004); N. D. Cent. Code Ann. §25–03.3 (Lexis 2002); Ore. Rev. Stat. §426.005 (1998); Pa. Stat. Ann., Tit. 42, §§9791 to 9799.9 (2007); S. C. Code Ann. §§44–48–10 to 44–48–170 (2002 and Supp. 2007); Tex. Health & Safety Code Ann. §§841.001 to 841.147 (West 2003); Va. Code Ann. §§37.2–900 to 37.2–920 (2006 and Supp. 2007); Wash. Rev. Code §71.09.010 (West 1992 and Supp. 2002); Wis. Stat. §980.01–13 (2005).

[5] See Ala. Code §15–20–26 (Supp. 2000) (restricts sex offenders from residing or accepting employment within 2,000 feet of school or child-care facility); Ark. Code Ann. §5–14–128 (Supp. 2007) (unlawful for level three or four sex offenders to reside within 2,000 feet of school or daycare center); Cal. Penal Code Ann. §3003 (West Supp. 2008) (parolees may not live within 35 miles of victim or witnesses, and certain sex offenders on parole may not live within a quarter mile from a primary school); Fla. Stat. §947.1405(7)(a)(2) (2001) (released sex offender with victim under 18 prohibited from living within 1,000 feet of a school, daycare center, park, playground, or other place where children regularly congregate); Ga. Code Ann. §42–1–13 (Supp. 2007) (sex offenders required to register shall not reside within 1,000 feet of any childcare facility, school, or area where minors congregate); Ill. Comp. Stat., ch. 720, §5/11–9.3(b–5) (Supp. 2008) (child sex offenders prohibited from

Seeking to counter the significance of the new capital child-rape laws enacted during the past two years, the Court points out that in recent months efforts to enact similar laws in five other States have stalled. *Ante*, at 21. These developments, however, all took place after our decision to grant certiorari in this case, see 552 U. S. ___ (2008), which gave state legislators reason to delay the enactment of new legislation until the constitutionality of such laws was clarified. And there is no evidence of which I am aware that these legislative initiatives failed because the proposed laws were viewed as inconsistent with our society's standards of decency.

On the contrary, the available evidence suggests otherwise. For example, in Colorado, the Senate Appropriations Committee in April voted 6 to 4 against Senate Bill 195, reportedly because it "would have cost about $616,000 next year for trials, appeals, public defenders, and prison costs." Associated Press, Lawmakers Reject Death Penalty for Child Sex Abusers, Denver Post, Apr. 11, 2008. Likewise, in Tennessee, the capital child-rape bill was withdrawn in committee "because of the high associated costs." The bill's sponsor stated that "'[b]e-cause of the state's budget situation, we thought to with-

---

knowingly residing within 500 feet of schools); Ky. Rev. Stat. Ann. §17.495 (West 2000) (registered sex offenders on supervised release shall not reside within 1,000 feet of school or childcare facility); La. Rev. Stat. Ann. §14:91.1 (West Supp. 2004) (sexually violent predators shall not reside within 1,000 feet of schools unless permission is given by school superintendent); Ohio Rev. Code Ann. §2950.031 (Lexis 2003) (sex offenders prohibited from residing within 1,000 feet of school); Okla. Stat., Tit. 57, §590 (West 2003) (prohibits sex offenders from residing within 2,000 feet of schools or educational institutions); Ore. Rev. Stat. §§144.642, 144.643 (1999) (incorporates general prohibition on supervised sex offenders living near places where children reside); Tenn. Code Ann. §40–39–111 (2006) (repealed by Acts 2004, ch. 921, §4, effective Aug. 1, 2004) (sex offenders prohibited from establishing residence within 1,000 feet of school, childcare facility, or victim).

draw that bill. . . . We'll revisit it next year to see if we can reduce the cost of the fiscal note.'" Green, Small Victory in Big Fight for Tougher Sex Abuse Laws, The Leaf-Chronicle, May 8, 2008, p. 1A. Thus, the failure to enact capital child-rape laws cannot be viewed as evidence of a moral consensus against such punishment.

### E

Aside from its misleading tally of current state laws, the Court points to two additional "objective indicia" of a "national consensus," *ante,* at 11, but these arguments are patent makeweights. The Court notes that Congress has not enacted a law permitting the death penalty for the rape of a child, *ante*, at 12–13, but due to the territorial limits of the relevant federal statutes, very few rape cases, not to mention child-rape cases, are prosecuted in federal court. See 18 U. S. C. §§2241, 2242 (2000 ed. and Supp. V); United States Sentencing Commission, Report to Congress: Analysis of Penalties for Federal Rape Cases, p. 10, Table 1. Congress' failure to enact a death penalty statute for this tiny set of cases is hardly evidence of Congress' assessment of our society's values.

Finally, the Court argues that statistics about the number of executions in rape cases support its perception of a "national consensus," but here too the statistics do not support the Court's position. The Court notes that the last execution for the rape of a child occurred in 1964, *ante*, at 23, but the Court fails to mention that litigation regarding the constitutionality of the death penalty brought executions to a halt across the board in the late 1960's. In 1965 and 1966, there were a total of eight executions for all offenses, and from 1968 until 1977, the year when *Coker* was decided, there were no executions for any crimes.[6]

————

[6]Department of Justice, Bureau of Justice Statistics, online at http://www.ojp.usdoj.gov/bjs/glance/tables/exetab.htm; see also Death Penalty Information Center, Executions in the U. S. 1608–2002:

The Court also fails to mention that in Louisiana, since the state law was amended in 1995 to make child rape a capital offense, prosecutors have asked juries to return death verdicts in four cases. See *State* v. *Dickerson*, 01–1287 (La. App. 6/26/02), 822 So. 2d 849 (2002); *State* v. *LeBlanc*, 01–1322 (La. App. 5/13/01), 788 So. 2d 1255; 2005–1981 (La. Sup. Ct. 5/22/07), 957 So. 2d 757; *State* v. *Davis,* Case No. 262,971 (1st Jud. Dist., Caddo Parish, La.) (cited in Brief for Respondent 42, and n. 38). In two of those cases, Louisiana juries imposed the death penalty. See 2005–1981 (La. Sup. Ct. 5/22/07), 957 So. 2d 757; *Davis, supra.* This 50% record is hardly evidence that juries share the Court's view that the death penalty for the rape of a young child is unacceptable under even the most aggravated circumstances.[7]

F

In light of the points discussed above, I believe that the "objective indicia" of our society's "evolving standards of decency" can be fairly summarized as follows. Neither Congress nor juries have done anything that can plausibly be interpreted as evidencing the "national consensus" that the Court perceives. State legislatures, for more than 30 years, have operated under the ominous shadow of the *Coker* dicta and thus have not been free to express their own understanding of our society's standards of decency. And in the months following our grant of certiorari in this case, state legislatures have had an additional reason to pause. Yet despite the inhibiting legal atmosphere that has prevailed since 1977, six States have recently enacted new, targeted child-rape laws.

I do not suggest that six new state laws necessarily

_____

The ESPY File Executions by Date (2007), online at http://www.death penaltyinfo.org/ESPYyear.pdf.

[7] Of course, the other five capital child rape statutes are too recent for any individual to have been sentenced to death under them.

establish a "national consensus" or even that they are sure evidence of an ineluctable trend. In terms of the Court's metaphor of moral evolution, these enactments might have turned out to be an evolutionary dead end. But they might also have been the beginning of a strong new evolutionary line. We will never know, because the Court today snuffs out the line in its incipient stage.

## II
### A

The Court is willing to block the potential emergence of a national consensus in favor of permitting the death penalty for child rape because, in the end, what matters is the Court's "own judgment" regarding "the acceptability of the death penalty." *Ante*, at 24. Although the Court has much to say on this issue, most of the Court's discussion is not pertinent to the Eighth Amendment question at hand. And once all of the Court's irrelevant arguments are put aside, it is apparent that the Court has provided no coherent explanation for today's decision.

In the next section of this opinion, I will attempt to weed out the arguments that are not germane to the Eighth Amendment inquiry, and in the final section, I will address what remains.

### B

A major theme of the Court's opinion is that permitting the death penalty in child-rape cases is not in the best interests of the victims of these crimes and society at large. In this vein, the Court suggests that it is more painful for child-rape victims to testify when the prosecution is seeking the death penalty. *Ante,* at 32. The Court also argues that "a State that punishes child rape by death may remove a strong incentive for the rapist not to kill the victim," *ante*, at 35, and may discourage the reporting of child rape, *ante*, at 34–35.

These policy arguments, whatever their merits, are simply not pertinent to the question whether the death penalty is "cruel and unusual" punishment. The Eighth Amendment protects the right of an accused. It does not authorize this Court to strike down federal or state criminal laws on the ground that they are not in the best interests of crime victims or the broader society. The Court's policy arguments concern matters that legislators should—and presumably do—take into account in deciding whether to enact a capital child-rape statute, but these arguments are irrelevant to the question that is before us in this case. Our cases have cautioned against using "'the aegis of the Cruel and Unusual Punishment Clause' to cut off the normal democratic processes," *Atkins* v. *Virginia*, 536 U. S. 304, 323 (2002) (Rehnquist, C. J., dissenting), in turn quoting *Gregg* v. *Georgia*, 428 U. S. 153, 176 (1976), (joint opinion of Stewart, Powell, and STEVENS, JJ.), but the Court forgets that warning here.

The Court also contends that laws permitting the death penalty for the rape of a child create serious procedural problems. Specifically, the Court maintains that it is not feasible to channel the exercise of sentencing discretion in child-rape cases, *ante*, at 28–29, and that the unreliability of the testimony of child victims creates a danger that innocent defendants will be convicted and executed, *ante,* at 33–34. Neither of these contentions provides a basis for striking down all capital child-rape laws no matter how carefully and narrowly they are crafted.

The Court's argument regarding the structuring of sentencing discretion is hard to comprehend. The Court finds it "difficult to identify standards that would guide the decisionmaker so the penalty is reserved for the most severe cases of child rape and yet not imposed in an arbitrary way." *Ante*, at 28–29. Even assuming that the age of a child is not alone a sufficient factor for limiting sentencing discretion, the Court need only examine the child-

rape laws recently enacted in Texas, Oklahoma, Montana, and South Carolina, all of which use a concrete factor to limit quite drastically the number of cases in which the death penalty may be imposed. In those States, a defendant convicted of the rape of a child may be sentenced to death only if the defendant has a prior conviction for a specified felony sex offense. See Mont. Code Ann. §45–5–503(3)(c) (2007) ("If the offender was previously convicted of [a felony sexual offense] . . . the offender shall be . . . punished by death . . ."); Okla. Stat., Tit. 10, §7115(K) (West Supp. 2008) ("Notwithstanding any other provision of law, any parent or other person convicted of forcible anal or oral sodomy, rape, rape by instrumentation, or lewd molestation of a child under fourteen (14) years of age subsequent to a previous conviction for any offense of forcible anal or oral sodomy, rape, rape by instrumentation, or lewd molestation of a child under fourteen (14) years of age shall be punished by death"); S. C. Code Ann. §16–3–655(C)(1) (Supp. 2007) ("If the [defendant] has previously been convicted of, pled guilty or nolo contendere to, or adjudicated delinquent for first degree criminal sexual conduct with a minor who is less than eleven years of age . . . he must be punished by death or by imprisonment for life"); Tex. Penal Code Ann. §12.42(c)(3) (2007 Supp.); ("[A] defendant shall be punished for a capital felony if it is shown on the trial of an offense under Section 22.021 . . . that the defendant has previously been finally convicted of [a felony sexual offense against a victim younger than fourteen years of age]").

Moreover, it takes little imagination to envision other limiting factors that a State could use to structure sentencing discretion in child rape cases. Some of these might be: whether the victim was kidnapped, whether the defendant inflicted severe physical injury on the victim, whether the victim was raped multiple times, whether the rapes occurred over a specified extended period, and

whether there were multiple victims.

The Court refers to limiting standards that are "indefinite and obscure," *ante*, at 30, but there is nothing indefinite or obscure about any of the above-listed aggravating factors. Indeed, they are far more definite and clear-cut than aggravating factors that we have found to be adequate in murder cases. See, *e.g.*, *Arave* v. *Creech*, 507 U. S. 463, 471 (1993) (whether the defendant was a "'coldblooded, pitiless slayer'"); *Walton* v. *Arizona*, 497 U. S. 639, 646 (1990) (whether the "'perpetrator inflict[ed] mental anguish or physical abuse before the victim's death'"); *Jurek* v. *Texas*, 428 U. S. 262, 269 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (whether the defendant "'would commit criminal acts of violence that would constitute a continuing threat to society'"). For these reasons, concerns about limiting sentencing discretion provide no support for the Court's blanket condemnation of all capital child-rape statutes.

That sweeping holding is also not justified by the Court's concerns about the reliability of the testimony of child victims. First, the Eighth Amendment provides a poor vehicle for addressing problems regarding the admissibility or reliability of evidence, and problems presented by the testimony of child victims are not unique to capital cases. Second, concerns about the reliability of the testimony of child witnesses are not present in every child-rape case. In the case before us, for example, there was undisputed medical evidence that the victim was brutally raped, as well as strong independent evidence that petitioner was the perpetrator. Third, if the Court's evidentiary concerns have Eighth Amendment relevance, they could be addressed by allowing the death penalty in only those childrape cases in which the independent evidence is sufficient to prove all the elements needed for conviction and imposition of a death sentence. There is precedent for requiring special corroboration in certain criminal cases. For exam-

ple, some jurisdictions do not allow a conviction based on the uncorroborated testimony of an accomplice. See, *e.g.*, Ala. Code 12–21–222 (1986); Alaska Stat. §12.45.020 (1984); Ark. Code Ann. §16–89–111(e)(1) (1977); Cal. Penal Code Ann. §1111 (West 1985); Ga. Code Ann. §24–4–8 (1995); Idaho Code §19–2117 (Lexis 1979); Minn. Stat. §634.04 (1983); Mont. Code Ann. §46–16–213 (1985); Nev. Rev. Stat. §175.291 (1985); N. D. Cent. Code Ann. §29–21–14 (1974); Okla. St., Tit. 22, §742 (West 1969); Ore. Rev. Stat. §136.440 (1984); S. D. Codified Laws §23A–22–8 (1979). A State wishing to permit the death penalty in child-rape cases could impose an analogous corroboration requirement.

C

After all the arguments noted above are put aside, what is left? What remaining grounds does the Court provide to justify its independent judgment that the death penalty for child rape is categorically unacceptable? I see two.

1

The first is the proposition that we should be "most hesitant before interpreting the Eighth Amendment to allow the *extension* of the death penalty." *Ante,* at 25 (emphasis added); see also *ante,* at 27, 30 (referring to expansion of the death penalty). But holding that the Eighth Amendment does not categorically prohibit the death penalty for the rape of a young child would not "extend" or "expand" the death penalty. Laws enacted by the state legislatures are presumptively constitutional, *Gregg,* 428 U. S., at 175 (joint opinion of Stewart, Powell, and STEVENS, JJ.) ("[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity"), and until today, this Court has not held that capital child rape laws are unconstitutional, see *ante*, at 17 (*Coker* "does not

speak to the constitutionality of the death penalty for child rape, an issue not then before the Court"). Consequently, upholding the constitutionality of such a law would not "extend" or "expand" the death penalty; rather, it would confirm the status of presumptive constitutionality that such laws have enjoyed up to this point. And in any event, this Court has previously made it clear that "[t]he Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling States from giving effect to altered beliefs and responding to changed social conditions." *Harmelin* v. *Michigan*, 501 U. S. 957, 990 (1991) (principal opinion); see also *Gregg, supra*, at 176 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

2

The Court's final—and, it appears, principal—justification for its holding is that murder, the only crime for which defendants have been executed since this Court's 1976 death penalty decisions,[8] is unique in its moral depravity and in the severity of the injury that it inflicts on the victim and the public. See *ante*, at 27–28. But the Court makes little attempt to defend these conclusions.

With respect to the question of moral depravity, is it really true that every person who is convicted of capital murder and sentenced to death is more morally depraved than every child rapist? Consider the following two cases. In the first, a defendant robs a convenience store and watches as his accomplice shoots the store owner. The defendant acts recklessly, but was not the triggerman and did not intend the killing. See, *e.g.*, *Tison* v. *Arizona*, 481

---

[8] *Gregg* v. *Georgia*, 428 U. S. 153 (1976); *Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976); *Woodson* v. *North Carolina*, 428 U. S. 280 (1976); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976).

U. S. 137 (1987). In the second case, a previously convicted child rapist kidnaps, repeatedly rapes, and tortures multiple child victims. Is it clear that the first defendant is more morally depraved than the second?

The Court's decision here stands in stark contrast to *Atkins* and *Roper*, in which the Court concluded that characteristics of the affected defendants—mental retardation in *Atkins* and youth in *Roper*—diminished their culpability. See *Atkins*, 536 U. S., at 305; *Roper*, 543 U. S., at 571. Nor is this case comparable to *Enmund* v. *Florida*, 458 U. S. 782 (1982), in which the Court held that the Eighth Amendment prohibits the death penalty where the defendant participated in a robbery during which a murder was committed but did not personally intend for lethal force to be used. I have no doubt that, under the prevailing standards of our society, robbery, the crime that the petitioner in *Enmund* intended to commit, does not evidence the same degree of moral depravity as the brutal rape of a young child. Indeed, I have little doubt that, in the eyes of ordinary Americans, the very worst child rapists—predators who seek out and inflict serious physical and emotional injury on defenseless young children—are the epitome of moral depravity.

With respect to the question of the harm caused by the rape of child in relation to the harm caused by murder, it is certainly true that the loss of human life represents a unique harm, but that does not explain why other grievous harms are insufficient to permit a death sentence. And the Court does not take the position that no harm other than the loss of life is sufficient. The Court takes pains to limit its holding to "crimes against individual persons" and to exclude "offenses against the State," a category that the Court stretches—without explanation—to include "drug kingpin activity." *Ante*, at 26. But the Court makes no effort to explain why the harm caused by such crimes is necessarily greater than the harm caused by the rape of

young children.  This is puzzling in light of the Court's acknowledgment that "[r]ape has a permanent psychological, emotional, and sometimes physical impact on the child."  *Ante,* at 24.  As the Court aptly recognizes, "[w]e cannot dismiss the years of long anguish that must be endured by the victim of child rape."  *Ibid.*

The rape of any victim inflicts great injury, and "[s]ome victims are so grievously injured physically or psychologically that life *is* beyond repair."  *Coker*, 433 U. S., at 603 (opinion of Powell, J.).  "The immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped."  Meister, Murdering Innocence: The Constitutionality of Capital Child Rape Statutes, 45 Ariz. L. Rev. 197, 208–209 (2003).  See also *State* v. *Wilson,* 96–1392, p. 6 (La. Sup. Ct. 12/13/96),685 So. 2d 1063, 1067; Broughton, "On Horror's Head Horrors Accumulate": A Reflective Comment on Capital Child Rape Legislation, 39 Duquesne L. Rev. 1, 38 (2000).  Long-term studies show that sexual abuse is "grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate."  C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990).

It has been estimated that as many as 40% of 7- to 13-year-old sexual assault victims are considered "seriously disturbed."  A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Sep Fed. Probation 69, 70 (1995).  Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide.  Meister, *supra*, at 209; Broughton, *supra*, at 38; Glazer, Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated

Rape Statute, 25 Am. J. Crim. L. 79, 88 (1997).

The deep problems that afflict child-rape victims often become society's problems as well. Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Broughton, *supra*, at 38; Glazer, *supra*, at 89; Handbook on Sexual Abuse of Children 7 (L. Walker ed. 1988). Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution. *Ibid.*

The harm that is caused to the victims and to society at large by the worst child rapists is grave. It is the judgment of the Louisiana lawmakers and those in an increasing number of other States that these harms justify the death penalty. The Court provides no cogent explanation why this legislative judgment should be overridden. Conclusory references to "decency," "moderation," "restraint," "full progress," and "moral judgment" are not enough.

### III

In summary, the Court holds that the Eighth Amendment categorically rules out the death penalty in even the most extreme cases of child rape even though: (1) This holding is not supported by the original meaning of the Eighth Amendment; (2) neither *Coker* nor any other prior precedent commands this result; (3) there are no reliable "objective indicia" of a "national consensus" in support of the Court's position; (4) sustaining the constitutionality of the state law before us would not "extend" or "expand" the death penalty; (5) this Court has previously rejected the proposition that the Eighth Amendment is a one-way ratchet that prohibits legislatures from adopting new capital punishment statutes to meet new problems; (6) the worst child rapists exhibit the epitome of moral depravity;

and (7) child rape inflicts grievous injury on victims and on society in general.

The party attacking the constitutionality of a state statute bears the "heavy burden" of establishing that the law is unconstitutional. *Gregg,* 428 U. S., at 175 (joint opinion of Stewart, Powell, and STEVENS, JJ.). That burden has not been discharged here, and I would therefore affirm the decision of the Louisiana Supreme Court.